SUNBURST OIL & REFINING CO., APPELLANT, *v.* CALLENDER, RESPONDENT.

(No. 6,361.)

(Submitted January 15, 1929. Decided February 13, 1929.)

[274 Pac. 834.]

*Mr. Homer G. Murphy,* and *Messrs. Hurd, Rhoades, Hall & McCabe,* for Appellant, submitted a brief; *Mr. Murphy* argued the cause orally.

*Mr. Louis P. Donovan,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Appeal from a judgment dissolving an injunction *pendente lite* and dismissing a proceeding to enjoin the drawing of casings from four producing oil wells.

In 1922 Mose Zimmerman and others leased a 320-acre tract of land in Toole county to the Sunburst Oil & Gas Company (now the Sunburst Oil & Refining Company) and L. C. Stevenson, for a term of ten years and as long thereafter as oil and gas should be produced therefrom in paying quantities, reserving as rental fifteen per cent of the oil or gas produced, to be delivered in kind or paid for at the market price, at their option. Stevenson thereafter assigned his interest in the lease to plaintiff, making it the sole lessee.

In 1923 plaintiff made what is designated an "assignment" of its lease, in so far as it covered an 80-acre subdivision of the tract leased, to O. O. Hesla, trustee, reserving an overriding royalty of twenty per cent of the oil produced, to be delivered in kind. Hesla assigned to the Buffalo Oil & Gas Company. During the year 1923 the Buffalo Company drilled two pro-

ducing wells on its leasehold, and in 1926 entered into a contract for the sale of its rights to the Crossfield Oil Syndicate for the sum of $17,000, $7,000 of which was to be paid on execution of the contract and the balance in deferred payments, and which contract required the Crossfield Syndicate to comply with the terms and conditions of the lease, including the delivery of plaintiff's twenty per cent of the oil produced from the wells then on the tract and from all wells thereafter drilled thereon. The syndicate made the down payment and was thereupon let into possession and forthwith drilled a third producing well, for the drilling of which it paid, and entered into a contract with this defendant to drill well No. 4, he to furnish everything necessary—"a turnkey job"—the contract price for which was $7,250. Defendant completed his contract, bringing in a fourth producing well, but was not paid the contract price.

Within six months after completing his contract, defendant herein filed a mechanic's lien against the leasehold and all improvements, including the four producing wells thereon, and thereafter foreclosed his lien by action wherein he made the Crossfield Syndicate and the Buffalo Oil & Gas Company defendants. He secured judgment and decree on December 27, 1927, upon which execution was issued and levied upon the property described in the lien, and, on January 17, 1928, defendant became the purchaser at execution sale of all of the personal property on the premises, and, on February 4, 1928, at a like sale he became the purchaser of the leasehold interest described.

Between January 17 and February 2, 1928, defendant removed from the land all fixtures and improvements placed thereon by, or at the instance of, the Crossfield Syndicate and Buffalo Oil & Gas Company, with the exception of the casing in the wells, and was then preparing to draw the casing, when plaintiff brought this action, alleging that such act would destroy the wells and jeopardize the leasehold and contiguous oil lands for oil development purposes, in all of which plaintiff had an interest. Plaintiff secured an injunction *pendente lite*,

but, on the hearing to make such injunction permanent, the court dissolved the injunction and dismissed the proceeding. From the order dissolving the injunction *pendente lite* and the judgment of dismissal, plaintiff has appealed.

1. On the trial, plaintiff having rested, the defendant sought to establish his right to draw the casing from the wells by the introduction in evidence of the judgment-roll in the lien foreclosure proceeding. The judgment-roll was admitted over the objection of plaintiff, and this ruling is made the basis of plaintiff's first assignment of error, counsel contending that the roll was not admissible, as plaintiff was not a party to the proceeding and its interest was not affected thereby, and, further, that the judgment had not become final.

While a person not made a party to an action is not *bound* by the judgment therein (sec. 10558, Rev. Codes 1921; *Conrow* v. *Huffine*, 48 Mont. 437, 138 Pac. 1094), and his rights, if any, are not affected thereby (*Soliri* v. *Fasso*, 56 Mont. 400, 185 Pac. 322), such a record is admissible for the purpose of making out a prima facie case, as to the rights of the party introducing it, in and to the subject matter of the action in which the judgment is entered (*Wells-Dickey Co.* v. *Embody*, 82 Mont. 150, 266 Pac. 869; sec. 10512, Rev. Codes 1921; Freeman on Executions, 2d ed., 1205).

As to the judgment not being final, the general rule is that a judgment-roll is admissible only after the judgment has become final (Jones on Evidence, 3d ed., 595; *Noe* v. *Matlock*, 64 Mont. 35, 208 Pac. 591), but this is because only a final judgment will ordinarily affect the rights of the parties. A party dissatisfied with a judgment may stay execution thereon pending an appeal by complying with the provisions of section 9735 of the Revised Codes of 1921; but, if no stay is secured, a judgment creditor may, at any time within six years after judgment, proceed to execution. (Sec. 9416, Id.) Here the record discloses that, regardless of whether an appeal was taken or was not taken, the property was sold at execution sale in partial satisfaction of the judgment prior to the commence-

ment of this action; the reason for the above rule ceased, and the rule should not, therefore, apply. (Sec. 8739, Id.)

The proof thus adduced, however, but establishes a prima facie defense, which may be overcome by evidence showing that the rights thus acquired by defendant cannot be exercised in such manner as to destroy the rights of plaintiff, a stranger to the foreclosure judgment and decree.

2. It is next asserted that the court erred in dissolving the injunction *pendente lite* and in rendering judgment of dismissal on the ground that plaintiff had an interest in the lease which could not be defeated by the proceedings had or affected by any rights acquired by the defendant.

It is contended by counsel for the defendant that the plaintiff assigned its lease, merely reserving to itself a new rent and therefore it was neither a necessary nor a proper party defendant in the lien foreclosure proceeding, and its rights are no more to be considered than are those of the owners of the land leased.

Undoubtedly, having drilled well No. 4 and furnished all fixtures and equipment necessary to complete the well and equip it for operation, and not having been paid for his labor and material, defendant had a lien upon the property on which he did the work and placed the improvements, on compliance with Chapter 91, Part V, Revised Codes of 1921 (sec. 8339, as amended by Chapter 23, Laws of 1925, and sec. 8375, as amended by Chapter 152, sec. 1, Laws of 1923). He could foreclose such lien in the manner therein provided, and, in such a proceeding to foreclose a lien asserted against a lease-hold interest only, neither the lessor nor, in the case of an assigned lease, the assignor, is a necessary party to the proceeding. (*Horn* v. *Clark Hardware Co.*, 54 Colo. 522, 45 L. R. A. (n. s.) 100, 131 Pac. 405; *Harrington* v. *Miller*, 4 Wash. 808, 31 Pac. 325; *Southard* v. *Moss*, 2 Misc. Rep. 121, 20 N. Y. Supp. 848; affirmed 141 N. Y. 607, 36 N. E. 740; 40 C. J. 400.) Further, in case of an assignment of a lease, the mere reservation of a new rent would not make the assignor a necessary party (35 C. J. 990, and cases cited), and the

fact that some injury would result to the real estate from the removal of fixtures therefrom is no ground for preventing such removal (*Stritzel-Spaberg Lumber Co.* v. *Edwards,* 50 Mont. 49, 144 Pac. 772).

Again, when an oil well is drilled under a lease, the well, the hole in the ground, becomes, of necessity, a part of the land and a part of the leasehold, but the hole in the ground without casing amounts to nothing as a well, and therefore the casing, inserted in the ground and to be left there as long as the well is in use, becomes a part of the well, and, consequently, of the leasehold, the well and casing being subject to a mechanic's lien for the labor performed and material furnished in drilling it. (*Devine & Thomas* v. *Taylor,* 12 Ohio Cir. Ct. Rep. 723; *Haskell* v. *Gallagher,* 20 Ind. App. 224, 67 Am. St. Rep. 250, 50 N. E. 485.)

3. However, it is admitted that the plaintiff herein owns a twenty per cent overriding royalty which it duly reserved from the operation of the transfer of its lease, and the question now arising is as to whether, by this reservation, it retained an interest in the lease, as all parties who have an interest in the property upon which the mechanic's lien is claimed must be made parties to the foreclosure proceeding. (40 C. J. 396; *Soliri* v. *Fasso,* above.) Herein the "property" is the leasehold interest; did the plaintiff "assign" all of the interest therein and merely reserve a "new rent"?

An assignment of a lease signifies a parting with the whole "term," which includes not only the whole of the unexpired time, but also the whole estate of the assignor—all his interests in the lease. (35 C. J. 988; *Dunlap* v. *Bullard,* 131 Mass. 161.) Anything short of this is not an assignment but a sublease. (35 C. J. 990.) Thus we have held that where, in an instrument, the first party reserved an overriding royalty and a portion of the time the lease was to run, although called an assignment, the instrument was in fact a sublease. (*McNamer Realty Co.* v. *Sunburst Oil & Gas Co.,* 76 Mont. 332, 247 Pac. 166.)

The reservation of the portion of the time, however, was not necessary to stamp the instrument as a sublease, as an assignment of all of the interest of the assignor, except reserved royalty, is not an abandonment of a lease (*Emerson* v. *Little Six Oil Co.* (C. C. A.), 3 Fed. (2d) 265), and an overriding royalty, properly reserved and protected, attaches as an interest in the lease (Mills-Willingham, Law of Oil and Gas, sec. 128, and cases cited; *Homestake Exploration Co.* v. *Schoregge*, 81 Mont. 604, 264 Pac 388.)

While testing and exploring for oil or gas, the lessee has but the right to seek a profit from the land, but, on discovery and production, the oil itself becomes the property of the lessee, and the percentage reserved as an overriding royalty, being an interest in the lease, becomes the property of the royalty holder, to be delivered to him in kind under the provisions of this transfer; if oil is produced, therefore, this interest becomes a substantial one, which should be protected. Such a transfer is therefore not an assignment but a sublease, and the royalty holder becomes, in effect, a joint lessee with his transferee, entitled to share in the production without a payment of a part of the operating expenses, and it cannot be said that the reservation is a new rent.

Conceding, for the purposes of this opinion, that the ▮ defendant established his right as a purchaser at execution sale to draw the casing from the wells, as against the defendants in the foreclosure proceeding, as this plaintiff had a substantial interest in the lease and was not made a party to the lien foreclosure proceeding, it is not bound by the judgment in that proceeding, and its interest cannot be jeopardized by any action taken under that judgment.

No matter what the rights of a purchaser at forced sale on foreclosure of a mechanic's lien may ordinarily be, therefore, the only rights which the defendant can assert in this action, as against this plaintiff, are those which he acquired by the purchase of the rights of the Crossfield Syndicate in the leasehold and in the personal property placed on the 80-acre tract by it. By the involuntary transfer, defendant stepped

into the shoes of the syndicate, and was then in a position to do all that the syndicate could have done, but nothing more.

4. Defendant contends that the lease itself grants to the ██ lessee the right to draw the casings at any time. It is true that the lease contains a provision that "the parties of the second part shall have the right at any time to remove all machinery or fixtures placed on the premises including the right to draw and remove casing"; but the lease must be read as a whole, and each and every part of it must, if possible, be given effect; one portion must be used to explain another in order to bring harmony to the whole. (*Steven* v. *Potlatch Oil & Refining Co.*, 80 Mont. 239, 260 Pac. 119.) The quoted clause must be read in connection with the other provisions of the lease. (*Slane* v. *Curtis* (Wyo.), 269 Pac. 31.) So read, the phrase "at any time" refers to that part of the term which is dependent upon oil or gas being found in paying quantities. (*Sheller* v. *Shivers*, 171 Pa. 569, 33 Atl. 95.)

The lease in question requires the drilling of a well 2,000 feet in depth, unless oil or gas in paying quantities is found at a lesser depth, and, if this well is successful, the lessee is required to drill out the demised premises in accordance with the best practices of experienced operators. Clearly it was not the intention of the parties, in inserting the above provision in the lease, that, immediately on the completion of a commercial oil well, the lessee might draw the casing and destroy the well, but, reading the provision for drawing casings in connection with the provision for drilling to a certain depth in testing the tract, it becomes apparent that such a right was given only in case oil was not discovered in paying quantities or, perhaps, after a producing well had ceased to yield oil in paying quantities. (*Slane* v. *Curtis*, above.)

It is said that "it is a well settled rule that casing in wells, derricks, engines, and other machinery and appliances placed upon the land by the lessee for testing, developing and operating the land for oil and gas purposes are trade fixtures. They may, therefore, be removed at any time during the existence of the lease, or within a reasonable time after its termination"

(Summers on Oil and Gas, 644); but, like the provision for such removal in the lease, this rule must be read with reference to the provisions of the lease, and can apply only to removal at a proper time, with due regard to the rights of others.

The right to remove fixtures is subject to the limitation that the agreement for removal does not violate any express provision of law and that the interest of the public generally, or of third parties in particular, shall not be injuriously affected by its fulfillment(Elwell on Fixtures, 2d ed., 215); and a lessee may be prevented from drawing the casing from a well, even at the termination of his lease, by judicial decree, where it would be inequitable to do so (Summers on Oil & Gas, 645, citing *Southwestern Oil Co.* v. *Kimball Oil Co.* (Tex. Civ. App.), 224 S. W. 1111; *Powers* v. *Bridgeport Oil Co.,* 238 Ill. 397, 87 N. E. 381. See, also, *Ohio Oil Co.* v. *Griest,* 30 Ind. App. 84, 65 N. E. 53).

Unlike the leasing of lands and tenements for the ordinary trade purposes, the chief consideration for the leasing of land for the exploration for oil and gas is its testing to discover if it contains oil or gas, and, if discovered, its development. If oil or gas is discovered in paying quantities, the operation of the well and consequent production of royalty to the owner becomes a part of the obligation of the lessee, which he cannot evade except by a breach of his contract.

As the successor of the Crossfield Syndicate, the defendant must assume the burdens of the lease along with its benefits (sec. 8750, Rev. Codes 1921), and must so use his rights as not to infringe upon the rights of another (sec. 8743, Id.).

This plaintiff had an interest in the lease on the 80-acre tract, and still held its lease upon the remainder of the 320-acre tract. The evidence is clear that the drawing of the casing would not only destroy the wells on the 80, but tend to destroy the entire leasehold interest in the tract and adjoining tracts, by subjecting the whole structure to the danger of flooding the oil sands with water. Such action would, then, come within all of the limitations placed above upon the right of a lessee to remove fixtures from the leasehold.

However, in order to enjoin the drawing of the casing by a lessee, the moving party must show that his rights would be injured thereby. (*Martel* v. *Hall Oil Co.*, 36 Wyo. 166, 52 A. L. R. 91, 253 Pac. 862, on rehearing, 36 Wyo. 166, 52 A. L. R. 91, 255 Pac. 3.) It may be conceded that, if the wells were not producing oil in paying quantities, the lessee would be at liberty to draw the casing, providing he did so in such manner and with such safeguards as not to injure another thereby, and to prevent the creation of a nuisance. It therefore becomes important to determine whether these wells were producing oil in paying quantities, or capable of such production.

We think the true criterion for determining whether a well ▇▇▇▇▇ is a commercial producer is: Will it pay a profit to the lessee, over operating expenses, for its operation? If it will, although the profit may be small and may never repay the cost of development, the well may be said to produce oil in paying quantities. (Mills-Willingham on Oil and Gas, 122, and cases cited.) The question is one of fact to be determined from the evidence, and, while due weight is to be given to the judgment of the lessee, the court is not bound by his opinion. (*Union Gas & Oil Co.* v. *Adkins* (C. C. A.), 278 Fed. 854; *Parks* v. *Sinai Oil Co.*, 83 Okl. 295, 201 Pac. 517; *Dickey* v. *Coffeyville Co.*, 69 Kan. 106, 75 Pac. 398; *Gypsy Oil Co.* v. *Ponder*, 92 Okl. 181, 218 Pac. 663.)

The defendant testified that he did not consider these wells commercial wells, and expressed what he termed his "private opinion" that, in order to constitute a commercial well, a well should produce 10 barrels of oil a day. On cross-examination, he admitted that he did not know what was considered a commercial well in the field in which these wells were located, and his testimony was further discredited by his reply in the foreclosure proceeding, a part of his own exhibit, which alleges that, "since the completion of said wells, the same have been used and operated * * * and production of oil in commer-

cial quantities has been obtained therefrom, and is still being obtained therefrom.'' This reply was verified August 4, 1927.

The testimony on the part of plaintiff shows that, during the calendar year of 1927, the four wells were hooked up to a single pumping plant and operated by one man, who was paid $250 per month, although pumpers could be hired at from $125 to $135 per month. This man also pumped two outside wells for which he received $65 per month. During that period, although No. 2 well was out of commission practically all of the time and No. 1 well a part of the time, due to the negligence of the lessee, the wells produced 5,662.37 barrels of fluid, of which ten per cent was water, leaving a production of oil of 5,096.14. The lessee's interest in the oil was sixty-five per cent or 3,312.49 barrels. During that period oil sold at $1.45 per barrel, but immediately thereafter the price went up, finally reaching $1.75 per barrel. The gross receipts from the sale of the oil saved to the producer in 1927 was therefore $4,803.11.

In view of the testimony regarding the reasonable wages of a pumper and the necessity of overseeing the work done, it would seem that the most that should be charged against operating expenses for this item would be the $250 per month, less the $65 received for pumping outside wells, or a yearly charge of $2,220.

Other expenses shown by the plaintiff amounted to approximately $100 per year, while defendant's counsel suggests others which should be considered, such as a license tax of two per cent on the gross, amounting to $147, cleaning well No. 2, $200, general taxes, not figured, renewing cups, etc., all of which operating expenses, however, cannot be shown to reach a total of $2,800 per year, thus leaving an excess, or net profit to the operator of more than $2,000, even in the manner in which the wells were pumped. If we do not deduct the $65 per month paid by other owners to the pumper, it would add but $780 to the operating expenses, and leave a net profit to the operator of more than $1,200.

It is therefore apparent that the evidence strongly preponderates in favor of a finding that the wells were producing oil in paying quantities, and against any implied finding to the contrary.

Under the above rules announced, as successor of the Crossfield Oil Syndicate, the defendant could not draw the casing and thus destroy the producing wells. The court therefore erred in dissolving the injunction *pendente lite* and in dismissing the action.

The judgment and order from which the appeal is taken are reversed, and the cause is remanded to the district court of Cascade county, with direction to grant the permanent injunction.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.

Rehearing denied March 8, 1929.