WILLS, Appellant, *v.* MORRIS et al., Respondents.

(No. 7,396.)

(Submitted September 18, 1935.   Decided October 17, 1935.)

[50 Pac. (2d) 862.]

Mr. *S. P. Wilson* and Messrs. *Pope & Garlington,* for Appellant, submitted a brief; Mr. *Wilson* and Mr. *Walter L. Pope* argued the cause orally.

516

*Mr. Elmer E. Hershey,* for Respondents H. W. Morris, Arnold Zaugg, David Morris, J. S. Bennett, F. M. Bennett, Arthur Keenan, Minnie Peterson and Ed Weider, submitted a brief and argued the cause orally.

*Mr. R. A. O'Hara* and *Mr. Thomas N. Marlowe,* for Respondent Patrick Hayes, submitted a brief and argued the cause orally.

*Mr. John E. Patterson,* for Respondents Jonathan Davis and Hazel Smith, Administratrix, submitted a brief and argued the cause orally.

*Mr. Albert Besancon,* for Respondents John A. Swanson and Arthur E. Swanson, submitted a brief and argued the cause orally.

*Messrs. Murphy & Whitlock,* for Respondents Albert Hall, Nina Hall, Eugene A. Hall, Robert Hall and Don T. Albee.

*Mr. E. C. Kurtz,* for Respondent Mary D. Borman.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This was an action brought for the purpose of procuring a complete adjudication of the water rights of the plaintiff and the defendants to the waters of Union Creek and its tributaries located in Missoula county.

Union Creek is a tributary of the Blackfoot River. The tributaries of Union Creek involved on this appeal are Camas, Ashby and Arkansas Creeks. By appropriate pleadings the various parties set up their claims for appropriations made by themselves or their predecessors. The action was tried to the

court, which viewed the premises. Findings of fact and conclusions of law were made and filed, and thereafter decree was entered in conformity therewith. This appeal is on behalf of the plaintiff from the judgment. An appeal was perfected to this court on behalf of certain of the defendants in cause No. 7,360, ante, p. 504, 50 Pac. (2d) 858, which was argued on the same day as this appeal and is this day decided. Three different decrees had theretofore been entered in the district court of Missoula county, adjudicating the waters of Union Creek and its tributaries, which rights are involved on the appeal. Neither the plaintiff nor any of his predecessors in interest were parties to any of these suits.

The waters of Arkansas Creek and also of Ashby Creek, a tributary of Camas Creek, were adjudicated in the case of *Hays* v. *Terry,* cause No. 2,050 in the district court of Missoula county, by decree entered on July 9, 1904. The waters of Upper Union Creek were adjudicated by decree of the district court of the named county, entered on October 20, 1913, in the case of *Joyce* v. *McDonald,* cause No. 2,167. The waters of Camas Creek were adjudicated by decree of the same district court entered in the case of *Slocum* v. *Swanson,* cause No. 2,862, on the fourth day of June, 1926. The point of confluence of these tributary creeks, the waters of which had theretofore been adjudicated, was on Union Creek above the point of diversion of plaintiff's water rights. On the trial of the cause, and over objection of plaintiff, the various defendants offered, and the court received, in evidence these different decrees.

The plaintiff sought to have it adjudged by the court that he was the owner of a water right out of Union Creek, based on an appropriation made by Tom McDonald, predecessor in interest of plaintiff, as of the date of August 15, 1882, amounting to 276 inches. The court found an appropriation made by McDonald in 120 inches of date of August 15, 1887. The court made findings of fact and decreed, with reference to the rights of the various defendants who had (either themselves or their predecessors in interest) been parties to some of the previous

suits mentioned supra, appropriations corresponding in dates and amounts to those found and decreed in the previous suits.

In the summer of 1882, Tom McDonald, the predecessor in interest of plaintiff, located in the valley of Union Creek, which is referred to throughout the record as "Potomac Valley," and the lands located therein were at that time unsurveyed. He located on the northwest quarter of section 15, and his brother John on the northeast quarter of section 16. The McDonalds, according to the testimony of Tom McDonald, in order to irrigate these lands posted a notice at the point of diverson on Union Creek in the summer of 1882, of the appropriation of the water of that stream, and built a dam and barely began the construction of a ditch on either side. He testified that the next year ditches were completed and the lands irrigated. The point of the construction of the dam and the ditches leading out of Union Creek was in what was afterwards determined to be the northeast quarter of section 15. After the lands were surveyed and it was determined that these lands were in section 15, it was thereby found that all of these lands in the section were a part and parcel of the Northern Pacific Railroad land grant. The survey of the lands was completed in this particular locality about 1886 or 1887, and at that time Ben Parsons settled on the northeast quarter of section 15, where the point of diversion of Tom McDonald's ditches was originally located. In view of the fact that it will become necessary later to discuss the testimony of Tom McDonald and other witnesses with reference to this particular right, we will refrain at this point from a further review of it.

As already indicated, plaintiff has specified as error the court's finding with respect to the Tom McDonald right, and its refusal to adopt his proposed finding with reference to the same. Also plaintiff has made specifications of error with relation to the rights awarded to the various defendants. Before proceeding, however, to a discussion of these various specifications, two preliminary questions of the law must be determined, namely: Was the alleged appropriation of Tom McDonald, if it be con-

ceded that it was made in 1882, invalid by reason of having
been initiated in trespass? And (2) were the decrees in the
previous water right suits, to which plaintiff and his predecessors
in interest were not parties, admissible in evidence and of any
evidentiary value in the establishment of the rights of the de-
fendants, as against the plaintiff? We will discuss these ques-
tions in the order stated.

The original Northern Pacific Land grant was by Act of
Congress of July 2, 1864 (13 Stats. at Large, 365). The
early case of *Northern Pacific R. R. Co.* v. *Majors,* 5 Mont. 111,
2 Pac. 322, 337, construed the terms of the grant, and in a
lengthy opinion the court stated its conclusions as follows: ''Our
conclusion, therefore, both from reason and authority, is that the
title of the respondent [railroad company] took effect at the
date of the approval of the Act of Congress; that the loca-
tion of the route and the survey of the lands, gave precision to
that title and caused it to attach to the particular sections, as
of the date of the approval of the Act, as fully as if such particu-
lar sections had been designated in the Act; that the character
of the title is that of a grant upon condition subsequent, and
that the office of the patent is to confirm the title as certain
designated portions of the road are completed and reported upon
by the commissioners, and render it absolute and unconditional.
(*Ferris* v. *Coover,* 10 Cal. 589.)''

This construction was in accord with that of the Supreme
Court of the United States in the case of *United States* v. *Mon-
tana Lumber & Mfg. Co.,* 196 U. S. 573, 25 Sup. Ct. 367, 368,
49 L. Ed. 604, wherein that court said: ''It has been decided
many times that such grants are *in praesenti,* and take effect
upon the sections of the land when the road is definitely lo-
cated, by relation as to the date of the grant.''

Defendants argue that under this construction, the lands on
which Tom McDonald assertedly constructed his ditches, and by
which he claimed to have made an appropriation of water,
were the property of the Northern Pacific Railroad Company;
that therefore McDonald was a trespasser, and under the deci-

sions of this court in the cases of *Prentice* v. *McKay*, 38 Mont. 114, 98 Pac. 1081, and *Warren* v. *Senecal*, 71 Mont. 210, 228 Pac. 71, his attempted appropriation was void. By Act of Congress, settlers on the public domain at the time in question were authorized to enter thereon and construct ditches for the appropriation of water. (43 U. S. C. A., sec. 661.)

The above contention presents the question whether the United States before the survey still exercised such proprietary interest over these Northern Pacific lands as would enable McDonald to act under the congressional consent and initiate an appropriation without thereby becoming a trespasser. In the case of *United States* v. *Montana Lumber & Mfg. Co.*, supra, the defendant there had entered on certain lands which were afterwards determined to be within the Northern Pacific land grant, and removed timber therefrom. The suit was brought in an effort to recover the value of the timber cut and removed by the defendant. The Supreme Court sustained the right of the government to maintain the suit, and in the course of its opinion said: ''Until the identification of the even and odd-numbered sections the United States retained a special property, at least, in the timber growing in the township; and this was sufficient to enable it to recover the value of the timber cut and removed by the defendants.''

This court, in the case of *Northern Pacific Ry. Co.* v. *Smith*, 62 Mont. 108, 203 Pac. 503, 505, speaking of the status of lands of the Northern Pacific land grant prior to their survey said: ''Until this [survey of the lands] has been done the federal government retains a proprietary interest in them, to the extent that it will exercise the same dominion over them as over its ungranted lands.''

Clearly, under the foregoing authorities the lands of the Northern Pacific land grant, prior to the survey, were a part of the public domain; and one who went on them for the purpose of making an appropriation of water and of constructing ditches thereon was not a trespasser, but was acting within the right expressly granted to settlers by Act of Congress. Our

522

conclusion is supported by a decision of the supreme court of Idaho under like facts, in the case of *Childs* v. *Sharai*, 8 Idaho, 378, 69 Pac. 111.

Proceeding now to the next question, plaintiff concedes that ■ the decrees in the former water right suits are binding as between the parties and their predecessors in interest, but denies that they are either binding on, or of any evidentiary value against, the plaintiff. The position of the defendants is that these decrees are not binding on the plaintiff, but admissible in evidence against the plaintiff, and that the trial court was entitled to consider them together with the other evidence in arriving at its decision in this cause.

In the case of *Galiger* v. *McNulty*, 80 Mont. 339, 260 Pac. 401, 403, a water right suit, a decree was, pursuant to stipulation, received in evidence as against a stranger, and there it was contended on appeal that the court was in error in giving effect to this decree as being "*res adjudicata* or as prima facie evidence or any evidence against defendants" who were not parties to the decree. The court disposed of that contention in the following language: "Had the court regarded these findings as *res adjudicata* as to defendants, the trial would have there ended, but they were not introduced or used to restrict appellants in their evidence in proving their claims or in combating the claims of plaintiffs. The introduction of the decree was to avoid the necessity of plaintiffs producing oral evidence as to the fact that they had made appropriations and the date and amount thereof; that is, to avoid a reproduction of the evidence that plaintiffs had some rights which it would require evidence to refute. It was to that point to which the stipulations and decree were directed. The decree was binding upon all parties to that action without any stipulation in the case at bar. When, under the stipulations, it was put in evidence with the oral testimony, a prima facie case was made by plaintiffs, and the defendants were given full opportunity to establish a superior or prior right or to disprove the claims of plaintiffs."

In *Sunburst Oil & Refining Co.* v. *Callender*, 84 Mont. 178, 274 Pac. 834, 836, defendant sought to establish its right to withdraw casing from an oil-well, by the introduction in evidence of the judgment-roll in a lien foreclosure proceeding which was the basis of its title, to which proceeding plaintiff was not a party. The judgment-roll was admitted over objection, and this ruling was urged as error in this court. The contention was disposed of by the court in the following language: ''While a person not made a party to an action is not *bound* by the judgment therein (sec. 10558, Rev. Codes 1921; *Conrow* v. *Huffine*, 48 Mont. 437, 138 Pac. 1094), and his rights, if any, are not affected thereby (*Soliri* v. *Fasso*, 56 Mont. 400, 185 Pac. 322), such a record is admissible for the purpose of making out a prima facie case, as to the rights of the party introducing it, in and to the subject-matter of the action in which the judgment is entered (*Wells-Dickey Co.* v. *Embody*, 82 Mont. 150, 266 Pac. 869; section 10512, Rev. Codes 1921; Freeman on Executions [2d Ed.] 1205).''

A water right acquired by virtue of appropriation is property. (*Moore* v. *Sherman*, 52 Mont. 542, 159 Pac. 966; *Smith* v. *Denniff*, 24 Mont. 20, 60 Pac. 398, 81 Am. St. Rep. 408, 50 L. R. A. 737, 741.) In 4 Jones on Evidence, second edition, page 3375, it is said: ''A judgment may constitute part of a chain of title to real or personal property. Though not amounting to title, it may show the character of the possession of one of the parties to a suit. In either case it is admissible in evidence for or against strangers, as well as for or against the parties to the original suit. Whenever a judgment transfers a title, or is the foundation of a claim to possession, it is admissible upon the same principle as a voluntary conveyance.'' In 2 Freeman on Judgments, fifth edition, page 2171, it is written: ''Whenever a judgment transfers a title, or is the foundation of a claim to possession, it is admissible, upon the same principle as a voluntary conveyance.''

In the case of *Lower Latham Ditch Co.* v. *Louden Irrigating Canal Co.*, 27 Colo. 267, 60 Pac. 629, 83 Am. St. Rep. 80, a water

right suit, it was held that a decree adjudging the water rights was not conclusive evidence as against strangers, but merely evidence of the right so adjudged. The following cases all hold that a water right decree may not be admitted in evidence as against a stranger to it: *Stocker* v. *Kirtley*, 6 Idaho, 795, 59 Pac. 891, *Andrews* v. *Donnelly*, 59 Or. 138, 116 Pac. 569, and *State ex rel. McConihe* v. *Steiner*, 58 Wash. 578, 109 Pac. 57. The last three cases cited all proceed on the theory that since a judgment is not binding on a stranger to a suit, it is inadmissible against him. One bound by a judgment is concluded by it. True, a judgment is not binding on a stranger; neither is a conveyance binding on a stranger; but to defeat a claim, one may introduce a conveyance as some evidence of a right to property. A water right, as we have noted supra, is property, and a judgment which in some measure determines or affects one's water right is admissible as against a stranger, not to conclude him, but to evidence the right of one in whose favor it is rendered, and on the trial of a cause it is to be considered by the court, together with the other evidence received touching the right in question.

Passing now to the alleged error of the trial court in fixing the date of the McDonald appropriation as August 15, 1887, instead of the date of August 15, 1882, as contended for by plaintiff, we find it necessary to review and consider the evidence concerning the date of the McDonald rights.

This court will not reverse the findings of the lower court unless the evidence clearly preponderates against them. (*Anaconda Nat. Bank* v. *Johnson*, 75 Mont. 401, 244 Pac. 141; *Warren* v. *Senecal*, 71 Mont. 210, 228 Pac. 71; *Allen* v. *Petrick*, 69 Mont. 373, 222 Pac. 451.) The plaintiff contends that the evidence clearly preponderates against the finding of the trial court. Thomas H. McDonald testified that he resided in Montana from 1882 until 1887, and arrived in the Potomac Valley in May, 1882; that he posted a water appropriation notice on the banks of Union Creek on the northeast quarter of section 15 of the township in question either the last of July or the first

of August, 1882 (he did not attempt to state the contents of this notice); that, though he constructed a dam, he dug no ditches during the summer of 1882 because he and his brother John could not use any water until the next year; and that in 1883 he and his brother first dug into the channel of the creek, and then "plowed the ditch out." After the witness had given this testimony, counsel made the following inquiry and McDonald made the following answer: "Q. Which side of the creek was this ditch on that you are speaking of now? A. Well, we plowed both of them on each side." He further testified that "those ditches didn't take much work; we done that in just a day or two." He described the manner of the construction of the ditches and their size, and stated that they flowed all the water through them that they would carry, and that they continued to use the ditches until after the results of the survey were known. He also gave the results of some of his own measurements of the quantity of water which these ditches would carry—an amount, according to his testimony, exceeding 300 inches. After these lines were established, it appeared that the ditches were located in Ben Parsons' field, and that he objected to their being there. The railroad company would not let McDonald "have the land" until the controversy over the location of the ditches was settled. This settlement was consummated by a written agreement, which was received in evidence, bearing date of October 28, 1890, and reading in part as follows: "And whereas, the said Thomas H. McDonald now has, and for a long time prior hereto, has had two water ditches running through and across a portion of the land above described, and which the said McDonald has used for conveying water for irrigation purposes to the land occupied by him, lying west of and adjoining the tract above described" (Parsons' land). By this agreement it was agreed on the part of McDonald that he would "abandon the ditches now used by him, on the northeast quarter of section 15, Township 13 North, Range 16 West, and upon the land claimed by the said Benjamin Parsons, and of all his rights, claims and interest of, in

and to said ditches, and of said land upon which the same are constructed." It was further agreed therein that McDonald might construct a ditch along the south boundary line of the Parsons tract, but on it, and for which he paid a consideration. McDonald testified that a new ditch was dug on this location by himself prior to the making of this agreement, following the survey or about 1886 or 1887. The first year he "poured" the water on the land "to see if he could not make it grow [wild] hay." There was very little wild hay growing on the land. They irrigated all of the land on both his and John McDonald's place which was adaptable to irrigation. The original ditches were plowed up and never used after the agreement was entered into with Parsons. He said the original ditch was not extended onto the John McDonald tract, and explained the method of irrigating his brother's land from this ditch, as follows: "The ditch itself reached John's land and then the flow from the end of mine; we let it go off on his land. I think it slopes towards —towards the creek towards the south. The water run a little south."

Tom McDonald also testified on rebuttal that in the "eighties" when they had the land in grain they had no permanent ditches, plowing them up each year and reconstructing them as needed. He said he raised hay and grain on the place before 1891.

Bert Lish testified that when eleven or twelve years of age he made his first trip into the Potomac Valley in 1883 and returned in 1885, remaining there until 1888. He said that in the summer of 1883 he had occasion—explaining in detail where he was going and the course he followed—to cross the location of one of the McDonald ditches; that he distinctly recalled observing a plow furrow, but did not know its purpose at the time; however, when returning in 1885, he found that it was McDonald's ditch.

Fred Hall, testifying as a witness on behalf of plaintiff, said he came to the Potomac Valley in 1887, lived there in 1894, and leased the Parsons land adjoining McDonald's from 1891

to 1894. He said of the Tom McDonald ditch: "It was already there when I came to the valley."

The defendant John A. Swanson testified that he first visited the valley in August, 1884, while looking for land, and that he had in mind securing the Gage place located above the McDonald land on Union Creek. He further testified that after looking over this land, he concluded to wait a few days before purchasing, and that he investigated to determine whether there were any water rights out of Union Creek. During the course of his investigation he followed down Union Creek across the Parsons and Tom McDonald lands as far as the John McDonald place; and that, though he found no ditches out of Union Creek below the Gage place, he found where "there was an attempt to make a ditch," and where "at one place there was a board across the creek and a few poles set," and that he observed nothing "that would interfere with water" if he desired "to take the water out above." On cross-examination he testified:

"Q. And you say there was a part of a ditch dug? A. Well, the head.

"Q. Or the head of a ditch dug? A. There was a little trench. There would be enough water probably to run through a row in a garden or something like that.

"Q. And did you look around to see if there was a garden there? A. There was a few withered cabbage heads there a few yards from the creek."

Frank Nelson testified that he farmed the Tom McDonald land in 1891 and the John McDonald land in 1892, and that the latter had never been farmed before; that he constructed the first ditches on this tract; that the main ditch on the south side of the Parsons place was begun before 1891 but not finished until 1892.

E. R. Kilburn testified that in 1885 he crossed the lands claimed by Tom McDonald, and neither crossed nor saw any ditches.

Charles Schwab, who resided in the Potomac Valley from 1882 to 1887 with his parents, being a boy of ten years of age at the time of his arrival, testified as follows:

"Q. Now, I will ask you, Mr. Schwab, if between 1882 when you went up on Union Creek, until 1887 when your people moved away and you moved away, there was any ditch from Union Creek conveying water for the land on the land owned by Tom McDonald or John McDonald, west of the Vaughn land? A. I never saw a ditch out of Union Creek from Vaughn's place down to the river.

"Q. Had you occasion to observe the creek down there? A. I had plenty of chance to see if there was any ditch along the creek because I went up and down the creek a good many times.

"Q. What were you doing? A. I was fishing and hunting, both.

"Q. And you say there were no ditches? A. I followed the creek just like anyone would that was fishing and I didn't see any ditch there."

The defendant Patrick Hayes, who moved into the valley in 1887, gave the following testimony with reference to the ditches:

"Q. What, if anything, do you know about Tom McDonald taking a ditch out of the north side of Union Creek? A. I seen him in 1887 plowing that ditch through a piece of ground he had plowed down north of there.

"Q. Had there been any ditch there previous to that time? A. No. He was just plowing the ground right out through there.

"Q. That was land in section 15, was it? A. It was on section 15; I think it was the northeast quarter of 15 he was working on."

A verified water right notice by McDonald, dated and recorded on June 1, 1889, claiming 300 inches of water for the northwest quarter of the section in question, asserting the date of the appropriation to be May 1, 1885, was received in evidence. McDonald neither admitted nor denied this notice.

Tom McDonald also gave testimony in support of the Albert Hall water right which he initiated in 1882 for lands three or four miles distant, up the creek, from the lands of the plaintiff. The trial court found in accordance with the testimony of Tom McDonald in adjudicating this right.

Plaintiff argues that the testimony of McDonald was the only evidence in support of the Hall right, and the court, having found in accordance with that testimony with reference to the Hall right, must have believed it, and the court having believed McDonald with reference to that testimony, there was no valid reason why it should not have believed it with respect to the plaintiff's water right. His argument is based on the assumption that the decrees referred to, supra, were inadmissible in evidence and that they were of no evidentiary value; however, we have ruled otherwise. The court had before it in support of its finding, with respect to the Albert Hall right, not only the testimony of McDonald, but also the decree adjudicating that right; and the testimony of McDonald with reference to the right and the date of appropriation, as adjudicated in that decree, were in accord.

After a review of the foregoing testimony, which is in conflict, we are unable to say that the evidence clearly preponderates in favor of the plaintiff, and we cannot say that there was no substantial evidence in the record tending to support the court's finding. The trial court in this case not only had the advantage of seeing the witnesses and hearing them testify, but viewed the premises and had the advantage of being able to interpret the testimony of these witnesses in the light of the information and knowledge it gained as a result of the view. The court, in addition to finding a right of 120 inches as of August 15, 1887, found an additional right of 100 inches as of May 1, 1892. We conclude from a careful review of the evidence that the court awarded to plaintiff the right as of August 15, 1887, as the right initiated for the Tom McDonald land, and the right of 100 inches as of May 1, 1892, as the right initiated for the John McDonald land. There is no sub-

stantial dispute as to the number of acres in these tracts under irrigation. The evidence discloses that 162 acres of the Tom McDonald tract are under irrigation, and 124 acres of the John McDonald place.

Most of the evidence presented is to the effect that an inch ▮ to the acre is necessary for the irrigation of these and other lands of similar character in the valley. The court awarded substantially that amount on various rights involved in this decree. True, there is some evidence by one of the parties and also by an irrigation expert, who was without experience in matters of irrigation in this particular valley, to the contrary. In the case of *Conrow* v. *Huffine*, 48 Mont. 437, at page 445, 138 Pac. 1094, 1096, this court said: "While we have no legislation on the subject, the rule has generally been observed by the courts of this state, in fixing the amount required for economical use, to allow one inch per acre, unless the evidence discloses that a greater or less amount is required."

We conclude that the trial court should have decreed an inch to the acre with reference to these two rights belonging to the plaintiff, and accordingly the findings and the decree should be modified so that plaintiff is awarded a right of 162 inches as of August 15, 1887, and 124 inches as of date May 1, 1892.

The court found that the defendant Don T. Albee was the ▮▮ owner and entitled to the use of 60 inches of the water of Ashby Creek as of date May 1, 1882. The plaintiff proposed a finding with reference to this right for a like amount of water, but as of date April 1, 1889. Error is assigned on these rulings. It is conceded that the lands to which the rights in question are appurtenant were patented to one Terry on May 4, 1892, and by conveyance the defendant Albee became the successor in interest of the title of Terry. One of the decrees mentioned, supra, was received in evidence adjudging that Terry was the owner of a water right of like date and amount as herein decreed. A notice of water right, duly verified, by one Donlan dated and recorded on October 5, 1885, claiming an appropriation of water as of the year 1882 under the Act of March 12,

1885, "relating to water rights," was offered in evidence. The effect of the Act referred to was well stated by this court in *Gilcrest* v. *Bowen*, 95 Mont. 44, 24 Pac. (2d) 141, 144, where we said: "In 1885 provision was made not only for the posting, but also for the recording of notice of appropriation; the appropriator was required to commence work within forty days and to prosecute it with due diligence in order that his right might relate back to the date of posting. Persons who had theretofore acquired water rights were permitted to reap the benefits of the Act by complying with its requirements within six months after its passage. The chief benefit afforded is that the recorded notice shall be received in all courts as 'prima facie evidence of the statements therein contained.' (Session Laws of 1885, p. 131; sections 1255–1259, Div. 5, Comp. Stat. 1887.)"

The use of the word "passage" in the foregoing quotation was an inadvertence, there immaterial, but the wording of the Act was "publication" instead. The Act was approved as noted, supra, but the certificate of the Secretary of the Territory appended to the Session Laws of 1885 bears date of the fourth day of May of that year. The laws could not well be published before they were authenticated; hence they were not published prior to that date. Here the notice was recorded within the six months' period specified in the Act, and therefore was prima facie evidence of a water right. (*Gilcrest* v. *Bowen*, supra.)

It is, however, contended that there was no evidence in the record connecting the water right notice filed by John Donlan with the defendant Albee or his predecessors in interest. It was testified that John Donlan lived on the lands in question and that Terry succeeded to. the possession of Donlan of these lands. Water was used on these lands in 1885 and the appearance of the ditches thereon at that time indicated that the water had been used there at an earlier date. Since the lands in the valley were not surveyed before 1886, or perhaps 1887, persons occupying the lands before the survey were, in common parlance, "squatters" who might acquire a water right and trans-

fer both their possessory right to the land and the water right orally. (*Gilcrest* v. *Bowen*, supra, and cases there cited.) Since the evidence in support of this right was not in conflict, the trial court could presume that the transfer of the possession from Donlan to Terry was lawful. In this state of the record, the evidence was ample to support the finding of the court.

The court, by its findings and decree, awarded 100 inches of water from Union Creek, as of the date of May 15, 1885, to the defendant David Morris. Plaintiff by his proposed findings suggested the date of April 1, 1889, for this right. The making of this finding and the rejection of the proposed one in the respect mentioned are specified as error by plaintiff. This right had theretofore been adjudicated in the case of *Joyce* v. *McDonald*, in cause No. 2,187 of the district court of Missoula county, and the decree therein was offered in evidence whereby the defendant Morris was awarded a like amount of water of the same date as was decreed herein. Morris testified that he was claiming the same land as was claimed by him in the previous suit, to which plaintiff or his successors were not parties; that he first saw the land in the fall of 1887, when it was covered with snow, and viewed it again in 1888 when he saw irrigation ditches on the land. His brother-in-law had prior to that time been farming this land. He further testified that about 150 acres of his land could be irrigated and were in need of water for irrigation, although about forty acres thereof required but little irrigation. H. W. Morris, a defendant in this action, and a brother of the defendant David Morris but not a claimant to the water right under discussion, testified that he visited these lands in the summer of 1887, and that his brother-in-law was irrigating at the time, and that they had been irrigated continuously since that time. He also gave testimony as to the size of the ditches. It was admitted on the trial that the defendant Morris was the owner and in possession of these lands. The evidence in support of this right is not disputed. On the whole, we think this evidence was sufficient to support the finding and decree in favor of the defendant David Morris.

The court found that the waters of Camas Creek, during the irrigation season from May 1 to September 1 of each year, were for more than thirty years preceding the trial wholly appropriated and diverted by the defendant John A. Swanson and other land owners located on the creek, and that none of the natural flow of the stream during this season flows into or becomes a part of the waters of Union Creek; that the lands of defendant Arthur E. Swanson adjoining are irrigated from a source other than Camas Creek, and as a result of the irrigation of these lands, seepage has arisen which was conveyed, by means of a drain ditch, onto the lands of defendant Patrick Hayes, who has utilized this water for the purpose of irrigating certain of his lands, and that this water was appropriated by Hayes on June 1, 1888; that his use thereof has been open and notorious for more than thirty years. Plaintiff has specified error on this finding.

The evidence discloses that near the boundary between the lands of the defendant John A. Swanson and the defendant Patrick Hayes was located an area containing one or more springs and inclined to be swampy; that as a result of irrigation of the Swanson lands, this condition is somewhat increased; that a predecessor in interest of Swanson secured the consent of Hayes to construct a ditch to drain the spring which was located on the lands of Hayes. It appeared that all of the waters of Camas Creek, during the irrigation season, are diverted and used by Swanson or other appropriators above him on the stream. Patrick Hayes, since the construction of the drain ditch, has utilized all of the water which collects therein, for irrigation purposes. The record does not disclose the amount of water which is thus obtained. It appears that below the Hayes lands or on the lower part of them, downstream from the springs, seepage enters Camas Creek, so that in the irrigation season water is flowing from Camas Creek into Union Creek at the point of their confluence. If it were not for the drain ditch, some flooding of the Hayes lands would occur.

Plaintiff argues that the above finding is ambiguous in that it cannot be ascertained therefrom whether the court found

an appropriation as of June 1, 1888, in favor of the defendant Hayes, in the nature of an appropriation of water from Camas Creek, or a tributary, or a finding of appropriation of water as seepage. He seriously objects to the finding on the latter theory. While it is true, as we understand the record, that the lands on which this water collected in the drain ditch are within the watershed of Camas Creek, and if a sufficient amount of water was collected therein some of it at least would ultimately reach Camas Creek, that condition, so far as the record discloses, obtains at times when there is more than the normal flow of water, during the irrigation season, in the stream in the valley. There is no evidence in the record to the effect that if the waters from the Swanson lands were not collected in the drain ditch and not utilized for irrigation by defendant Hayes, the waters of Camas Creek at the point of confluence with the waters of Union Creek would be in any way augmented above what they are under the existing conditions and method of utilizing the drainage water during the past thirty years. We are unable to ascertain from the record what amount of water might flow toward Camas Creek from this swampy area, if at all, what distance it would have to flow, and whether any of it would in fact reach the channel of the creek.

Plaintiff founds his argument on statements appearing in the opinion of this court in the case of *Popham* v. *Holloron*, 84 Mont. 442, 275 Pac. 1099, 1102, wherein, after observing that our statute, section 7093 of the Revised Codes 1921, enacted in that year, provides for the appropriation of seepage waters, it was said: ''Prior to its enactment we had no provision for the appropriation of flood, seepage, and waste waters as such, and, in the absence of statutory authority to make use of such vagrant or fugitive water, no right could be acquired as against the owner who seeks to recapture them (*Stookey* v. *Green*, 53 Utah, 311, 178 Pac. 586), but having passed beyond control of the owner they became 'abandoned personalty' which could be taken up and used by the person first in the field (*Clemens Horst Co.* v. *New Blue Point Min. Co.*, 177 Cal. 631, 171 Pac. 417; *Elgin* v. *Weatherstone*, 123 Wash. 429, 212 Pac. 562; *Dickey* v. *Mad-*

*dux,* 48 Wash. 411, 93 Pac. 1090). This taking and use of such waters does not constitute an appropriation as that term is used in our statutes, as the taker acquired no such usufruct right in the water as to entitle him to compel the continuation of the condition furnishing him with water (*Stepp* v. *Williams,* 52 Cal. App. 237, 198 Pac. 661; *Brosnan* v. *Boggs,* 101 Or. [472], 477, 198 Pac. 890; *Wedgworth* v. *Wedgworth,* 20 Ariz. 518, 181 Pac. 952), or prevent the owner of land which has become saturated by waste water from draining his land in such manner as to cut off the flow from the user (*Garns* v. *Rollins,* 41 Utah, 260, 125 Pac. 867, Ann. Cas. 1915C, 1159). These rules, however, apply to surface or waste water while outlawed and before it reaches or forms a stream flowing in a natural channel.''

In the case of *Rock Creek Ditch & Flume Co.* v. *Miller,* 93 Mont. 248, 17 Pac. (2d) 1074, 1080, 89 A. L. R. 200, this court said: ''The owner of the right to use the water—his private property while in his possession, may collect it, recapture it, before it leaves his possession, but, after it gets beyond his control, it thus becomes waste and is subject to appropriation by another. (*Newton* v. *Weiler,* 87 Mont. 164, 286 Pac. 133; *Galiger* v. *McNulty,* supra [80 Mont. 339, 260 Pac. 241].) And so it is with percolating water. (*Popham* v. *Holloron,* supra.)''

In this case, the waters which are originally seepage are collected in the drain ditch and from that source are utilized for irrigation. In the *Popham Case,* on which plaintiff relies, the following observation was made: ''Where, also, vagrant fugitive waters have finally collected and reached a natural channel and thus lose their original character as seepage, percolating, surface, or waste waters, and flow with such regularity as above described, whether from rains raising the surface of a lake until it overflows (*Duckworth* v. *Watsonville Water & Light Co.,* 150 Cal. 520, 89 Pac. 338), seepage and percolation forming springs (*Le Quime* v. *Chambers,* 15 Idaho, 405, 98 Pac. 415, 21 L. R. A. (n. s.) 76), surface water collecting in a canyon (*Denver, T. & Ft. W. R. Co.* v. *Dotson,* 20 Colo. 304, 38 Pac.

536

322), artificial water over which the creator has lost control (*Hagerman Irr. Co.* v. *East Grand Plains Drainage District,* 25 N. M. 649, 187 Pac. 555), water from artesian wells accidentally developed while drilling for oil (*Dé Wolfskill* v. *Smith,* 5 Cal. App. 175, 89 Pac. 1001), or water of a slough fed by seepage from irrigation (*McPhee* v. *Kelsey,* 44 Or. 193, 74 Pac. 401, rehearing 44 Or. 193, 75 Pac. 713), the waters flowing in such natural channel constitute a watercourse within the meaning of the law of water rights.''

Although the trial court used the term ''seepage'' in describing these waters, and seepage was the immediate source of most of the water collecting in the drain ditch, the diversion and appropriation of the water is made from this ditch after its loss ▆ by the defendant Swanson. Upon the authorities cited supra, we hold that, when collected in the drain ditch, it was subject to appropriation, that the appropriation so found was a valid one, and that plaintiff has wholly failed to show that such appropriation in any way interferes with his rights.

The court, by subdivision b of finding No. 4, found a water ▆ right of 60 inches out of Union Creek as of June 1, 1883, in favor of the defendant Hayes. Plaintiff assigns as error both the date of the appropriation and the amount. This right had not been adjudicated by any of the decrees mentioned supra. The tract of land for which the appropriation was originally made was settled on while unsurveyed, by one Gage. In August, 1884, he surrendered the possession and sold his improvements to Frank Nelson, who was a witness in support of the right. He testified to a ditch taken out of Union Creek which had been used for the diversion of water continuously since August, 1884; that water was taken out of the ditch that year; that Gage had a stack of hay containing about sixty-five tons which he purchased from him in 1884. He said that from its appearance the ditch, when he first saw it, ''was an old ditch.'' No one attempted to testify when or by whom the ditch was constructed, and there is no evidence of any irrigation on the lands prior to the year 1884 by anyone. Some of the witnesses testified as

to irrigation subsequent to the year 1884 on the land. The court, in order to base its finding as of June 1, 1883, in preference to 1884, had to found it on the opinion of Nelson that the ditch was an old ditch. We think this testimony was sufficient as a basis for a finding of the initiation of this right at or near the irrigation season beginning in 1884, but insufficient to base thereon the right as of June 1, 1883. Accordingly, the trial court is directed to amend its finding, conclusions of law and decree so as to change the date of this appropriation from June 1, 1883, to the same date in the year 1884.

The amount of land which can be irrigated from this particular ditch or appropriation is indeed obscure. Plaintiff asserts that under the record no more than forty-five acres can be irrigated, or has been irrigated, and defendant Hayes has suggested no testimony more favorable to his cause. Accordingly, we think the amount is somewhat excessive and that it should be reduced from 60 inches to 50 inches.

Many other specifications of error are made in the brief of plaintiff and argued. In view of what we have already said, the contentions of the plaintiff cannot avail in support of these other specifications of error, and it would unduly prolong this opinion to treat each of them in detail. We have examined them carefully and have discussed as many specifications as appears necessary to demonstrate the reasons for our conclusions and with respect to all of them.

The cause is remanded to the district court of Missoula county, with directions to modify and amend the findings of fact, conclusions of law and decree in the respects specifically herein mentioned, and when so amended and modified, the judgment will stand affirmed. Each of the parties will pay his or her own costs on this appeal.

ASSOCIATE JUSTICES MATTHEWS, STEWART and MORRIS concur.

MR. CHIEF JUSTICE SANDS, absent on account of illness, takes no part in the above decision.

Rehearing denied November 12, 1935.