No. 82-390

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

OSCAR HILL,

Respondent and Cross-Appellant,

-vs-

MERRIMAC CATTLE COMPANY,
INC.,

Appellants and Cross-Respondents.

APPEAL FROM:   District Court of the Tenth Judicial District,
In and for the County of Judith Basin,
The Honorable B.W. Thomas, Judge presiding.

COUNSEL OF RECORD:

For Appellants/Cross-Respondents:

Jardine, Stephenson, Blewett & Weaver; John D.
Stephenson, Jr. argued, Great Falls, Montana

For Respondent/Cross-Appellant:

Loble & Pauly; C. Bruce Loble argued, Helena,
Montana

For Amicus Curiae:

Donald D. MacIntyre, Special Assistant Attorney General,
For Department of Natural Resources, Helena, Montana

Submitted:   December 22, 1983

Decided:   August 10, 1984

Filed:  AUG 10 1984

*Ethel M. Harrison*

Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

I.  GENERAL ORIENTATION AND STATEMENT OF ISSUES

Defendant, Merrimac Cattle Company (Merrimac) appeals and plaintiff, Oscar Hill (Hill) cross-appeals from parts of an order of the state Water Court, sitting in Judith Basin County, deciding the water rights between the parties. On the issues raised by Merrimac, we affirm in part and reverse in part, and remand for further findings and hearings, if necessary. On the issues raised by Hill, we also affirm in part and reverse in part, and remand for further findings and to take additional evidence if necessary.

Hill contends that this Court has no jurisdiction to hear any of the issues until the entire basin is adjudicated, and in response to this issue, we ordered further briefing. We also asked the parties to brief the question of whether the decree of the Water Court can be appealed before the District Court has decided the trespass and damage claims of the parties based on Hill's complaint and the counterclaim of Merrimac. We conclude that we do have jurisdiction and that based on the circumstances of this case, an appeal is proper before the trespass and damage claims are decided by a jury. See Part III of this opinion.

This appeal primarily concerns the water rights to Martin Creek and Davis Creek, although other streams or springs are also involved. For example, Hill raises the issue of whether Cameron Coulee (a springs) is a tributary of Martin Creek or Paul Creek. In addition, the parties raise general issues not specifically relating to Martin or Davis

Creek. We first set forth the issues as they relate to each creek or stream and then set forth other more general issues.

(1) Prescriptive Use: Martin Creek and Davis Creek. Although Merrimac contends it has first priority to Martin Creek and Davis Creek water, Merrimac appeals from the Water Court's decree and order in holding that Merrimac did not prove a prescriptive use right to either Martin Creek or Davis Creek water. We affirm the Water Court's holding. See Part IV of this opinion.

(2) Priorities to Martin Creek Water. Merrimac contends that it established first priority to Martin Creek water and therefore that the priorities should be reordered. Hill cross-appeals and raises two issues. Hill argues that the Water Court should have permitted Hill to irrigate those lands based on the priorities established and as they were described in a 1929 Judith Basin District Court case, entitled Spencer v. Silve. One of the parties, Joe Fergus, was a predecessor to Hill. Hill also contends that the Water Court erred in awarding any water rights to Merrimac because Merrimac failed to prove that its fields were irrigated by Martin Creek water. We affirm the Water Court on Merrimac's appeal and on Hill's cross appeal. See Parts V(A), and VI of this opinion.

(3) Priorities to Davis Creek Water. Merrimac contends that the priorities it was granted should take precedence over the priorities granted to Hill. Merrimac also contends that the Water Court improperly relied on the complaint and answer filed by Joe Fergus in the 1929 District Court case of Spencer v. Silve, Fergus, and Duncan. The Water Court relied on the answer and counterclaim by Fergus in establishing 1884 priority dates for Hill. Hill cross-appeals and contends

- 3 -

that the evidence is insufficient to establish even those priority rights granted to Merrimac, and therefore that Merrimac has no priorities over Hill to the use of Davis Creek water. Hill also contends that the Water Court improperly admitted in evidence a letter from an attorney to Joe Fergus in relation to that 1929 case, by which Merrimac argued that Fergus had abandoned his attempt to prove 1884 priority dates for Davis Creek water.

We hold that the Water Court improperly relied on the answer and counterclaim in the 1929 case as a basis to establish priority dates for Hill. We hold further that the letter from the attorney to the client was properly admitted in evidence. We further hold that the evidence is sufficent to establish Merrimac's priority dates. Although the Water Court is affirmed in part and reversed in part, the effect of our holding is that Merrimac is entitled to priorities to the use of Davis Creek water. See Parts V(B), and VII of this opinion.

(4) Whether Cameron Coulee is a Tributary to Martin Creek or to Paul Creek. Hill's cross-appeal claim contends that Cameron Coulee is a tributary to Martin Creek or to Paul Creek, and if correct, this would entitle Hill to the excess water from Cameron Coulee after Merrimac first used the 18.6 miner's inches granted by the Water Court based on historical usage. The Water Court, however, held that Cameron Coulee is not a tributary to either Martin Creek or Paul Creek, and we affirm. See Part VIII of this opinion.

(5) Measure of water flow for each acre under irrigation. Merrimac contends that the Water Court should have granted Merrimac 1.25 miner's inches for each acre under irrigation for all of its water rights, rather than the 1

- 4 -

miner's inch granted. Hill does not dispute this 1.25 factor as such, but argues that if it is the proper factor, then Hill should also be granted 1.25 miner's inches per acre for each of its water rights. Because we are uncertain what the Water Court intended, and because evidence exists to support each figure, we remand to the Water Court to enter additional findings and to take more evidence if necessary. See Part IX of this opinion.

(6) Possibility that Hill was allotted excess water because of failure to determine the precise acreage Hill had under irrigation. The Water Court granted Hill 1,890 miner's inches of water based on a measure of 1 miner's inch per acre. However, in doing so the Water Court failed to determine the number of acres that Hill has under irrigation. Merrimac therefore contends that Hill was awarded excess water because Hill has far less than 1,890 acres under irrigation. We remand for further findings, and more evidence if necessary, to determine the acreage that Hill has under irrigation. See Part X of this opinion.

(7) Failure to set forth the land descriptions on which Hill is presently irrigating. Hill contends that the Water Court mistakenly restricted the use of his water to the specific land as described in his predecessor's land patents rather than setting forth the descriptions of land on which water is presently being applied. Merrimac agrees that the cause must be remanded for this determination. We remand for further findings and more evidence is necessary to determine and describe the land that Hill is presently irrigating. See Part XI of this opinion.

II. BACKGROUND FACTS

The Merrimac and Hill ranch lands are adjacent, with the Merrimac lands being upstream from the Hill lands. All of the streams involved in the litigation involve Merrimac as the upstream user and Hill as the downstream user. The ranches are on the eastern side of the Highwood Mountains, and are in a valley bisected by Martin Creek and Davis Creek, two of the primary streams involved in this litigation. The low lands of both ranches are irrigated from Martin Creek and Davis Creek and their tributaries. Martin Creek eventually becomes a tributary to Davis Creek.

Both ranches trace their origin to land homesteaded in the 1880's. Merrimac consists of land first homesteaded and settled by John and Conrad Sack on Davis and Martin Creek in 1883. Merrimac was started by A. J. McDonald and is currently operated by Lenny J. McDonald, the fourth generation to grow up on the ranch and take over operations. Merrimac bought the Sack land in 1910, and additional land was acquired in 1916 from Ed Simpson, who in 1882 was the first homesteader on Davis Creek.

The Hill Ranch traces its beginning to the Fergus family. Annie Fergus homesteaded on Davis Creek in 1885, and a number of her children homesteaded on surrounding parcels. One child, Owen Fergus, acquired most of the already homesteaded parcels, and enlarged the ranch with other purchases. Later, transfers by deed and inheritance resulted in all the Fergus holdings consolidating in Anna Marie Duncan. Anna Marie married Felix Hill, and their minor children inherited the ranch when Anna Marie and Felix died in 1952 and 1954 respectively. A guardianship was established and Lenny McDonald, Merrimac president and second generation McDonald, and Carlo Hill, an uncle of the minor

- 6 -

Hill children, as co-guardians. That guardianship continued until 1965. One of the minor children, John, stayed on the ranch and continued to operate it until 1975, at which time the ranch corporation known as "ZV Ranch" was dissolved. The Hill ranch land was then transferred to Oscar Hill, who grew up on the ranch, and who continues to operate it.

The parties dispute the priorities of water rights in Martin Creek and Davis Creek. There had never been a serious dispute between the parties or their predecessors until the spring of 1980. At that time, Hill entered Merrimac's land without notice and without permission blocked Merrimac's Martin Creek ditch and Davis Creek ditch. The Martin Creek ditch led to Merrimac's "Martin Creek Meadow," and the Davis Creek ditch led to Merrimac's "Simpson Place" meadows. Hill also blocked several other ditches leading from Davis Creek.

Hill followed his ditch cut-offs with two lawsuits. In District Court, Hill obtained an ex parte temporary restraining order that ordered Merrimac to cease irrigation from Martin Creek, Davis Creek, Mountain Stream, and Paul Creek. These are the main streams from which Merrimac acquires its irrigation waters. This order effectively deprived Merrimac of irrigation water for its hay crops. Hill followed this restraining order by filing an action in Water Court to determine the priorities of the rights in the streams in question.

Merrimac followed with its own lawsuit. Before Merrimac was served with process from the Water Court on the priorities issue, Merrimac filed an action in District Court against Hill alleging trespass against Hill and seeking injunctive relief and damages for Hill's actions in blocking the irrigation ditches. In this case, Hill filed a

- 7 -

counterclaim, seeking damages against Merrimac for wrongful diversion of irrigation water.

The parties agreed to a consolidation of the District Court cases because of common questions of law and fact. In addition, Merrimac asked that the Water Court determine the respective water rights first, and then that the trespass and damage claims would be tried to a jury after final determination of the water rights litigation.

III. JURISDICTION TO HEAR THE APPEAL

We ordered briefing on the question of whether the Judith Basin Water Court order awarding priorities between the two parties is a final and appealable order. The question is whether it is final and appealable under the statutory scheme set out in the Water Use Act, section 85-2-211, et seq., MCA, and specifically, section 85-2-235, MCA. The question involves both a consideration of whether the Water Use Act contemplates an appeal in such circumstances, and a question of whether the order is final because the trespass and damages claims have not yet been decided.

Merrimac argues that this Court does have jurisdiction and Hill argues that we do not have jurisdiction. Hill argues first that the order deciding the rights of Merrimac and Hill is only temporary because it is subject still to a basin-wide adjudication of rights, and that based on sections 85-2-234, and 85-2-235, MCA, a party can appeal only from a basin-wide "final decree." Hill further argues that any opinion from this Court would necessarily be subject to possible reversal by the Water Court when it adjudicates the entire basin in which the streams flow.

We conclude that because this dispute involves only two parties and it is necessary that they must know their irrigation water allowances, it would be against the purpose of the Water Use Act to require them to wait for the basin-wide decree before appeal to this Court. The purpose of the Water Use Act, and the 1979 amendments establishing the water courts, are to quantify the many water users' rights in Montana's water and to speed up decisions on those water rights. This Court is not certain when this particular basin will have a final hearing and adjudication, and the rights of the parties cannot in the meantime be held in abeyance. We further note that any decision of this Court on the rights between the parties can be meshed with the Water Court's further adjudication of the rights of other parties who may have earlier or later priority rights than the parties to this action.

The pendency of the trespass and damage claims does not deprive this Court of jurisdiction to hear the appeal. The Water Court, at the request of the parties, entered a Rule 54(b) certification, and we are convinced that the order, under these facts, is proper. Although the cases have been consolidated because of common issues of fact and law, the trespass and damage claims cannot be properly resolved until the water rights of the parties have been first determined. The Water Court entered an order on the water rights of the two parties, but the trespass and damage claims cannot be determined by the Water Court. The Water Court, therefore, ruled on all the issues that are within its jurisdiction.

We further note that Hill's argument would end up with a decision on the trespass and damage claims that could not be appealed until basin-wide adjudication of the water rights

claims. Hill's position, regardless of which party prevails, would have the effect of depriving the losing party of the right to a speedy appeal on issues over which the Water Court has no jurisdiction. That is not the purpose of the Water Use Act.

IV. MERRIMAC FAILED TO PROVE PRESCRIPTIVE USE TO WATERS OF MARTIN CREEK AND DAVIS CREEK

Although Merrimac also claims that its priority dates for use of water come before those of Hill, Merrimac contends that it acquired a prescriptive right to the use of Martin Creek and Davis Creek waters that defeats any first priorities awarded to Hill. Merrimac contends that it has been using the water adversely from the 1800's through 1980, when the dispute between the parties first erupted. However, we affirm the Water Court's ruling that Merrimac did not prove prescriptive use of rights.

Two prescriptive rights statutes are involved. From the years between 1895 and 1953, a 10 year period was required to acquire a prescriptive right. (See Section 486, Code of Civil Procedure 1895, and later statutory codifications.) In 1973, the legislature reduced the statutory period from 10 years to 5 years. See Ch. 224, § 4, Laws of Montana (1953), now codified as section 70-19-404, MCA. In 1973, the Water Use Act eliminated the right to acquire a water use right by prescription. Merrimac contends it perfected its right before the effective date of this statute.

Although Merrimac contends it adversely used Martin Creek and Davis Creek water to the detriment of Hill from the 1800's until 1980, for purposes of analysis, three time periods are involved: the late 1880's to 1954; 1954-1965; and 1965-1973.

The Water Court initially rejected Merrimac's contention that it acquired adverse possession between the late 1880's and 1954, and between 1954 and 1965. However, the Water Court initially also held that Merrimac established adverse possession between the years 1965 and 1973, at which time the Water Use Act went into effect prohibiting the acquiring of water rights by adverse possession. Later, however, the Water Court reversed itself and held that Merrimac did not acquire adverse possession during the years 1965 to 1973. The Water Court essentially held that through all the years involved, the late 1880's to 1973, use of Martin Creek and Davis Creek water by the parties was based on an accommodation, thereby defeating Merrimac's claim to adverse use.

In addition to the Water Court's basic conclusion that use of water by the parties was always based on an accommodation between the parties, the court held also that a guardianship which Lennie McDonald of Merrimac had over the Hill ranch between the years of 1954 and 1965, prevented the statutory period from running as a matter of law. Lenny McDonald, as a co-guardian of the Hill ranch, could not acquire an interest adverse to his ward. The Water Court properly noted that to start the prescriptive period running anew after the expiration of the guardianship in 1965, Merrimac was required to notify Hill that it claimed water adverse to Hill's interest, and this was never done.

The Water Court reviewed the testimony of Lenny McDonald, who ran the Merrimac ranch operations before Jim McDonald took over in 1966. During the period Lenny McDonald became a co-guardian over the Hill ranch, and during the time of his guardianship, Lenny McDonald testified Merrimac did

not claim or take water to the detriment of the Hill operation. Jim McDonald, who took over Merrimac's operations in 1966, agreed with the testimony of Lenny McDonald, and he testified that in dry years, in order to accommodate Hill, Merrimac decreased its water use from Martin Creek and Davis Creek so that Hill would have his share of water for irrigation. Jim McDonald further testified that the two operations "shared the water" and that he had no understanding with Hill as to who held the priority rights of the water. Although he testified that Merrimac took approximately 1/3 of the flow, the quantity varied each year depending on the flow, and sometimes even the 1/3 did not always provide the water that Merrimac needed. This evidence is fatal to Merrimac's claim that its use of the water during those years was exclusive and uninterrupted.

Based on this testimony, the Water Court concluded that "the history of Merrimac water use was based on an accommodation reached between the parties without any certain understanding of their respective right; and arrangements which endured until 1980 (the year this dispute erupted) to the mutual satisfaction of the parties for most of the time . . ." The Water Court further concluded that the water use by Merrimac "prior to 1966, if not permissive, at least is not shown by the evidence to have been under a claim of right, adverse to Hill, communicated in some way to Hill." Our review of the record leads us to affirm this holding.

Merrimac focuses strongly on the years 1954 to 1973 as being a period when it used water adversely to the interests of Hill. Although Merrimac acknowledges the existence of the co-guardianship by Lennie McDonald over the Hill operations from 1954-1965, Merrimac argues that nonetheless it could

acquire a prescriptive use right during this time period. Merrimac argues that the other co-guardian could have protected the Hill guardianship interests by asserting the legal rights of the guardianship, and further, that John Hill, who became 21 in 1961 could have asserted legal rights on behalf of the Hill ranch. Failure to do so, Merrimac argues, means that Merrimac successfully used this time period to acquire a prescriptive right to the use of Martin Creek and Davis Creek water. We agree with the Water Court, however, that Merrimac could not acquire rights adverse to the Hill guardianship during the time that Lenny McDonald remained a guardian over the Hill operations, which was lasted until 1965.

Merrimac also argues, without citing evidence, that it nonetheless established a prescriptive use right after the guardianship ended and before the law changed eliminating the right to acquire water rights by prescriptive use. The Water Court concluded, however, and Merrimac cites no contrary evidence, that after the guardianship ended Merrimac did nothing to Hill that could be construed as starting the prescriptive period running again. In fact, as previously noted, Jim McDonald testified that during this time period the two operations "shared the water."

Finally, Merrimac argues that it is entitled to a fractional share of Martin Creek and Davis Creek water because from the beginning it has always taken a fractional share of the water. Although the testimony generally stated that Merrimac took at least 1/3 of the water, the fact is that whatever share was taken did not adversely affect Hill so as to start a prescriptive period running. Until shortly before the events erupted leading to this lawsuit, Merrimac

had taken no action to deprive Hill of its water based on its priority claims. The cases cited by Merrimac are not on point because they decide issues where the claimed adverse user, in appropriating a fractional share, actually deprived the other party of a part of his water supply based on a previous appropriation. Merrimac's fractional use argument, as a basis to claim a prescriptive right, has no application to this case.

We therefore conclude that the Water Court was correct in holding that Merrimac did not prove its claim of prescriptive use to the water of Martin Creek and Davis Creek. We next discuss the question of whether the Water Court, based primarily on documentary evidence, correctly established the priorities for Martin Creek and Davis Creek.

V. WHETHER A 1929 DISTRICT COURT CASE DECIDING SOME RIGHTS OF HILL'S PREDECESSOR, SHOULD ALSO CONTROL SOME PRIORITIES ISSUES IN THIS CASE

A major issue concerning the priorities to Martin Creek and Davis Creek water turns on the application of a 1929 water rights case in which Owen Fergus, Hill's predecessor, was involved. Merrimac Cattle Company, in existence at the time, was not a party to the lawsuit. As to Martin Creek, the trial court granted certain priorities to Fergus, and Hill contends those findings and the decree should control in this case. As to Davis Creek, Fergus alleged in his answer and counterclaim that he had May 1, 1884 and May 15, 1884 priority rights to use of Davis Creek water.

In deciding the case, the Water Court refused to be bound by the findings and decree establishing Fergus' priorities to Martin Creek, and ruled that the 1929 decree was not based on adequate facts. From this ruling Hill

cross-appeals. On the other hand, the Water Court relied on Fergus' answer and counterclaim in the 1929 case in ruling that Hill had established two 1884 priority dates for the use of Davis Creek water. The Water Court found that the counterclaim and answer were sufficiently corroborated by the testimony of Ray Hill that Hill had the priority rights to Davis Creek water. From this ruling Merrimac appeals.

We hold that the Water Court correctly rejected the findings and decree in that 1929 case as deciding the water priorities to Martin Creek. We also hold, however, that the Water Court erred in relying on the answer and counterclaim of Fergus in deciding the priorities to Davis Creek water.

Martin Creek flows into Davis Creek and the creek continues under the name of Davis Creek. Frank Spencer owned land downstream from the confluence of Martin Creek and Davis Creek, and he irrigated this land. Neil Silve owned land on Martin Creek and irrigated land from Martin Creek. Spencer sued Silve, alleging that Silve had interfered with the use of his downstream water rights. Silve, in turn, cross-complained against Owen Fergus and Maggie Duncan, in effect seeking to show that it was Fergus and Duncan who had interfered with the Spencer water rights. At issue were priorities to Martin Creek water, and the use of Davis Creek water downstream from the confluence of Martin Creek and Davis Creek.

For Martin Creek the trial court granted Fergus certain water rights and established the priority dates for those rights. In this case, Hill now contends that those priority dates, the water flow rate established, and the area where water was applied, must be given full force and effect in the litigation between Hill and Merrimac. Hill appeals from the

refusal of the Water Court to give full force and effect to the 1929 decree.

For Davis Creek, the trial court in the 1929 decree did not establish any priorities for Fergus, and in fact Fergus agreed at the conclusion of the trial that his rights to use of Davis Creek water were not involved, and in effect Fergus withdrew his claim to the 1884 priority dates alleged in his answer and counterclaim. The trial court did, however, grant six priority dates to Frank Spencer for use of Davis Creek water, the first right being in 1894, and the last right being in June 1899. Fergus did not appeal from this final decree. In this case, Merrimac appeals from the Water Court's ruling that granted two 1884 priority dates to Hill based on allegations contained in the Fergus answer and counterclaim in the 1929 case.

We discuss each of the creeks separately.

A.    MARTIN CREEK--THE WATER COURT PROPERLY RULED THAT OTHER EVIDENCE DEMONSTRATED THE 1929 ADJUDICATION OF MARTIN CREEK TO BE IN ERROR.

In deciding the Martin Creek issue, the Water Court properly recognized that a water rights decree is binding on the parties to the action and their successors in interest (State ex rel. Knight v. District Court (1941), 111 Mont. 520, 111 P.2d 292), but that it does not bind a stranger to the litigation, although the decree may be admitted as "some evidence of the water right" (Wills v. Morris (1935), 100 Mont. 514, 50 P.2d 862). In ruling that the 1929 decree deciding Martin Creek priorities was in error, the Water Court based its ruling on Desert Land entries and Homestead entries filed by members of the Fergus family, as contained in the National Archives. The Desert Land entries indicate

- 16 -

that much of the land involved in the 1929 Spencer v. Silve decree, had not actually been placed under irrigation until the late 1890's rather than in the 1880's as determined in the Spencer v. Silve decree. The Water Court noted that the Homestead entries, made no reference to ditches or irrigation on the land involved. The Water Court further decided that the 1880's Homestead entries, which did not refer to ditches or irrigation on the land involved, were circumstantial evidence that irrigation could not have been developed to the extent claimed by Fergus within two or three years of settlement on the homestead.

It is clear to this Court that the National Archives documents relating to applications for Desert Land patents and Homestead patents by members of the Fergus family, establish that ditches were not built nor water placed on the land involved until the late 1890's. These documents thoroughly impeach the findings made in the 1929 decree, and considered with the improbabilities of land irrigation by either James Fergus or Mary Fergus, a conclusive case is made for the disregard of the 1929 findings and decree.

The 1886 and two 1888 priority dates for Owen Fergus established in the 1929 decree cannot be reconciled with the Desert Land entries and Homestead entries made by members of the Fergus family, all of which entries establish by sworn affidavit in the application for a land patent, that water was applied to the land much later than 1886 and 1888. In fact, most entries establish that water was not applied until as many as 10 years after the 1886 and 1888 priority dates set in the 1929 case.

The Desert Land applications required, and sworn statements were made by the individual Fergus family

applicants, that: the land had never been previously occupied or settled; that the lands were dry and arid; and that the land had never been previously reclaimed by conducting water on the land.

In one way or another, at least part of the Desert Land claims filed by the Maggie Fergus family on separate land in the same area, includes land for which the 1929 decree granted certain priority rights to Owen Fergus. The 1929 decree, however, establishes priority dates earlier than the dates of water application established by the Desert Land entries. For example: (1) Part of the land involved in the 1929 decree included land on which Annie Fergus obtained a Desert Land patent. The decree established the priority water right in 1886; the Desert Land documents state that water was first applied in the months of May, June and July of 1900. (2) Part of the land involved in the 1929 decree based on a water application by Mary Fergus in 1888, was part of the Owen Fergus Desert Land claim where he stated water was first applied in 1895. (3) Part of the land involved in the 1929 decree based on a water application by Mary Fergus in May 1888, was part of a Desert Land claim by William Fergus where he stated that as of June 5, 1897 the land was dry and arid and had not been previously irrigated.
(4) Part of the land involved in the 1929 decree based on a water application by Mary Fergus in 1888, was part of Elizabeth Fergus' Desert Land patent application, where she stated that water was first applied to the land in 1899.

Homestead patent applications produced similar contradictions. Part of the land covered by the 1929 decree establishing that James Fergus placed it under irrigation in 1886, was actually part of the Annie Fergus homestead claim

- 18 -

settled by her in 1885. Regardless of who did the irrigating, the Water Court found it improbable that ditches could be built and water applied so soon after the 1885 homestead entry.

The 1929 decree established that James Fergus had placed some land under irrigation in 1886, but the homestead claim documents establish that part of this same land was homesteaded by Owen Fergus in 1885 and by Ed Simpson in 1882. It was impossible for James Fergus to have acquired water rights on homesteads occupied by others before the time that he supposedly began irrigating--in 1886.

Based on this evidence above, the Water Court was clearly justified in disregarding the 1929 decree on the ground that it was based on erroneous findings of fact.

Beyond the National Archives documents, however, additional evidence suggests that it would be highly improbable that either James Fergus or Mary Fergus had built the ditches and applied the water in the manner specified in the 1929 decree. The evidence establishes that neither James Fergus nor Mary Fergus had an interest in any of the land involved, that their ages at the time the ditches were built and water applied would make it improbable that they had done the work, and further, that it would be unlikely that they could have accomplished the prodigious feats required to be in accord with the findings supporting the 1929 decree.

The 1929 decree was based on an appropriation of 1 miner's inch per acre. The decree grants water rights to Owen Fergus based on three priority dates: (1) That in June 1886, James Fergus had applied 320 miner's inches to the land involved--which translates into 320 acres. (2) That on May 1, 1888, Mary Fergus had applied 300 miner's inches to

certain land. (3) That on June 1, 1888, <u>Mary Fergus</u> had applied 140 miner's inches to other land involved.

In the essential findings for the three water rights, the decree found that James Fergus, with regard to the priority rights of 1886 (Fergus ditch no. 1) was the grantor and predecessor in interest of Owen Fergus and Maggie Duncan; and that for two priority rights of 1888 (Fergus ditch no. 3 and Fergus ditch no. 7) Mary Fergus was the grantor and predecessor in interest of Owen Fergus and Maggie Duncan. But nowhere does the record establish these facts. The only place where the record indicates such to be the case is in the answer and counterclaim filed by Owen Fergus in that 1929 case, where he alleged these to be facts. The record does not establish that either James Fergus or Mary Fergus had any interest in the land involved, or had any interest in claimed water rights that could be conveyed to anyone.

Furthermore, the appropriations contained in the 1929 decree would have required superhuman efforts from James Fergus and Mary Fergus to accomplish the ditch digging and water applications within the time period involved.

James Fergus was the brother of Owen Fergus, and although he died as a young man, if he had been living during 1886, the date of appropriation and application of the water for Fergus ditch no. 1, he would have been approximately 24 years old. Mary Fergus was also the sister of Owen Fergus, and was one of the youngest of Maggie Fergus' seven children. At the time of the alleged appropriations and applications of the water for Fergus ditch no. 3 and Fergus ditch no. 7, as determined by the 1929 decree, she would have been in her late teens--probably 18 or 19. It would indeed be a prodigious feat for James Fergus to build a ditch and apply

320 miner's inches (translated into 320 acres) in one year. And it would also require a superhuman effort by Mary Fergus, a young lady of 18 or 19, to dig two ditches for the 1888 water rights and apply a total of 420 miner's inches of water--translated into application of water to 420 acres. Accomplishment of such feats would be highly improbable, if not impossible.

Based on these factors, it is clear that a proper evidentiary basis did not exist for the decree entered in 1929. The Water Court was therefore correct in disregarding the decree.

The effect of our holding on this issue is that the priority dates for Martin Creek do not change based on the findings and decree entered in the 1929 case of Spencer v. Silve. The priorities of the parties are examined in Parts VI and VII of this opinion.

B. DAVIS CREEK

The Water Court took a completely different position with regard to the Davis Creek priorities and the effect of the 1929 case of Spencer v. Silve. The decree did not directly decide the claims of Owen Fergus to Davis Creek water, but the Water Court nonetheless relied on the answer and counterclaim of Owen Fergus to establish the priorities ahead of Merrimac. The Water Court gave the answer and counterclaim the required evidentiary value because it found that no contrary evidence was presented and because the claim was sufficiently corroborated by the testimony of Ray Hill to the effect that Merrimac generally let Hill use Davis Creek water whenever Hill requested. We hold that the Water Court improperly relied on the answer and cross-claim in the 1929

case and that Ray Hill's testimony cannot be interpreted as creating an 1884 priority date for Hill.

Hill claimed two 1884 water priority dates based on the 1929 litigation. In the 1929, case Owen Fergus, Hill's predecessor, claimed first a priority date on May 1, 1884 based on the building of a ditch and the appropriation of 40 miner's inches of water by William Conway--referred to as the "Conway Ditch." Fergus claimed a second priority date of May 15, 1884, based on the building of a ditch and the appropriation of 100 miner's inches of water by Joe Papillion (an alleged squatter)--referred to as the "Papillion Ditch." The 1929 lawsuit did not directly resolve those claims, however, because Fergus requested the trial court to find, and the trial court did find, that "no rights of either of the defendants, Owen Fergus or Maggie Duncan, to the waters of said Davis Creek are involved in this action." The trial court did, however, establish seven rights for Frank Spencer in Davis Creek--starting in 1894 and the last one having a priority date of June 1899. Owen Fergus did not appeal from the final judgment.

We emphasize that Merrimac does not dispute the existence of either ditch as such. Rather, Merrimac disputes the date when each ditch was built, and further questions whether the ditches were built by William Conway and Joe Papillion.

During the trial of this case, the Water Court admitted a letter written in 1929 to Owen Fergus from one of his attorneys after the 1929 case was decided, and although the Water Court's decision makes implicitly clear that it did not rely on the letter, Hill cross-appeals from the admission of the letter into evidence on the ground that it violated the

attorney-client privilege that Hill could still assert as a successor to Owen Fergus. Merrimac sought the letter's admission on the ground that it reflects a clear intent at trial to abandon any claim to water rights based on the alleged 1884 appropriations.

The letter states in pertinent part:

"The decree dated the 26th date of February 1929. By the decree of Court you have been granted all that you asked for. Mr. Slattery [the attorney's partner] tells me that the right to water through certain small ditches were abandoned by you at the trial; for instance, you did not insist on any right under the old Papillion Ditch, which had not been used for a considerable time."

The answer and counterclaim filed by Owen Fergus in the 1929 case had no evidentiary value. The rule has long been that statements in pleadings may be used against the pleader, but they may not be used to advance the pleader's cause. Taque v. John Appliance Co. (1903), 28 Mont. 51, 72 P. 297; 63 A.L.R.2d 415, ("Pleadings as Evidence.") And this rule does not change simply because the pleadings may be old enough to be classified as an "ancient document" within the meaning of the evidence code. See Rule 803(16), M.R.Evid., which makes admissible as an exception to the hearsay rule, "statements in a document in existence twenty years or more, the authenticity of which is established." Whether or not the answer and counterclaim can be considered a hearsay exception to admissibility because of their age, the fact remains that the nature of the document must still be considered when considering the weight it can be given in proving a point in controversy. Its status as an answer and a counterclaim did not change because of its age, and it was still subject to the rule set forth in Taque, supra. Simply stated, the self-serving statements of Hill's predecessor,

Owen Fergus, could not be used some 50 years later to advance Hill's cause.

In relying on the testimony of Ray Hill as the corroborating evidence sufficient to dignify the answer and counterclaim as evidence, we assume that the Water Court concluded that Ray Hill's testimony convinced the Water Court that Hill always had priority rights over Merrimac to use of Davis Creek water, without regard to the actual dates when the rights were first acquired. Ray Hill was born in 1938 and he testified that as a child (in the 1940's) he remembered that his father (Oscar Hill) always seemed to get Davis Creek water when he wanted it. He also testified that Lennie McDonald (of Merrimac) would sometimes be waiting for Hill's father to finish irrigating before Merrimac would use any water. Although the Water Court inferred from these statements that Hill had priority over Merrimac, the overall view that the Water Court had of the relationship between the parties and their historical water use practices, is at odds with this finding.

In deciding the prescriptive issue raised by Merrimac (see Part IV, supra), the Water Court based its refusal to find a prescriptive use on the evidence that from the beginning the water use of Martin Creek and Davis Creek between Merrimac and Hill was based on an accommodation rather than on either party asserting its claims to priority. That is, when Hill asked for the water perhaps he got it, but the use was based on an accommodation between the parties rather than on Hill's assertion of a claim to priority use. We further emphasize that Ray Hill never testified directly that he knew Hill had prior rights or that he had heard Hill assert or Merrimac acknowledge that Hill had prior rights.

Rather, Ray Hill merely assumed that Hill had prior rights because Merrimac would release water at Hill's request. This testimony, to be consistent with the Water Court's overall finding and conclusion on the accommodation relationship between the parties, can easily be construed as evidence of this accommodation.

Several additional factors lead us to conclude the Water Court should have rejected Hill's claim to the two 1884 priority dates.

The earliest documentation for the existence of either the "Conway Ditch" or the "Papillion Ditch" is an engineer's map prepared for the Spencer v. Silve water rights lawsuit. Assuming that the map was made in 1926, just after the lawsuit was filed, we can assume that both ditches were in existence for some time before this date, but no basis exists to establish any particular year, let alone all the way back to 1884.

The March 17, 1900, Homestead patent application of Owen Fergus and the other documents required to be filed in conjunction therewith, based on his entry in 1885, fail to refer to the Papillion Ditch or to irrigation being conducted through the ditch, even though the ditch was on part of the land constituting the homestead. It is true that a homestead patent does not depend on either the building of ditches or actual application of water, but the preemption proof form, filed on May 5, 1900, in support of the Homestead patent application, provides questions as to the improvements placed on the land since the original entry (see Part VI of this opinion.) Had the ditch existed and had water been applied, it seems most probable that Owen Fergus would have provided this information in his preemption proof document.

The District Court's grant of Davis Creek priority rights to Frank Spencer in the 1929 case is not consistent with the Water Court's grant to Hill of 1884 water priorities. In the 1929 case Owen Fergus effectively withdrew any contention that he was entitled to priorities to use Davis Creek water based on 1884 appropriation dates. In the 1929 case, the court granted six priority dates to Spencer, the first beginning in 1894 and the last beginning June 1899. The effect of the Owen Fergus assertion that his rights to use of Davis Creek water were not involved, is a concession that any rights he had to the use of Davis Creek water would come after the last priority date of Frank Spencer in June 1899.

This interpretation is further buttressed by the attorney to client letter that Hill raises as a cross-appeal issue. The letter written to Fergus (quoted, previously) clearly discloses the intent of Fergus in effectively withdrawing his claims to the two 1884 priority dates. Hill contends that the letter was not admissible because it involved a privileged communication between attorney and client and because the letter contained inadmissible hearsay.

The letter corroborates Merrimac's contention that Owen Fergus abandoned his claim to an 1884 priority date, and its admission did not violate the attorney-client privilege. The letter referred only to completed litigation and to Owen Fergus' choice to give up his claim to an 1884 priority date. Nothing in the record indicates that Fergus gave confidential information to his attorney that was disclosed in the letter, nor did the attorney give any legal advice in the letter. The letter was simply a recap of what had taken place during

the trial of the 1929 Spencer v. Silve case and the results of that trial as they affected Owen Fergus.

The letter did not contain inadmissible hearsay. The letter summarized the results of the 1929 litigation as it affected Owen Fergus. The attorney was acting as Fergus' agent concerning a matter within the scope of his agency and this evidence was not excludable by the hearsay rule. See Rule 801(d)(f)(2), M.R.Civ.P. The letter was strong evidence of the fact that Fergus had given up on his attempt to establish an 1884 priority date for use of Davis Creek water, and that Fergus had given up this claim with full knowledge of the consequences of his action. His failure to appeal the final judgment meant that he conceded. He at least had no claim to Davis Creek water that arose before the last right of Frank Spencer with a priority date of June 1899.

For all of these reasons, we conclude that the Water Court improperly relied on the answer filed by Fergus in that 1929 water rights case, and that the testimony before the Water Court did not corroborate the allegations in the answer that would give Hill an 1884 priority date. The effect of our holding is that Hill is not entitled to the May 1, 1884 priority date for the "Conway Ditch" and is not entitled to the May 15, 1884 priority date for the "Papillion Ditch." We discuss the relative priorities for Davis Creek water in Part VII of this opinion.

VI. WATER PRIORITIES--MARTIN CREEK

Both parties appeal from the order and decree setting

forth the priorities to Martin Creek water. The decree granted Hill first, third, fourth, and equal fifth priorities. The decree granted Merrimac second and equal fifth priorities. We affirm the decree setting forth the Martin Creek priorities.

Merrimac raises one issue on the priorities granted, and Hill raises two issues. The Water Court granted Merrimac an equal fifth priority with a priority date of May 1, 1900, and Merrimac contends that instead it should be a first priority with a "summer of 1886" priority date (based on a homestead preemption claimed for that year). Hill argues that not only did Merrimac not prove an 1886 priority, but in his cross-appeal claims that Merrimac is entitled to no priority at all for this claim because Merrimac failed to prove that the land was irrigated by Martin Creek water. Hill argues that the water for irrigation could just as likely have come from Cameron Creek (a/k/a Pacific Creek). Hill further claims in his cross-appeal that he should have been awarded the same priorities for and places of use as were awarded to James Fergus in the 1929 District Court decree referred to in Part V of this opinion. On this issue, however, we have already concluded that the Water Court correctly refused to rely on that decree (see Part V(A) of this opinion), and we therefore hold that Hill cannot rely on the 1929 decree to establish his water priorities and areas of use for Martin Creek water.

The evidence is undisputed that in 1886, Conrad Sack, Merrimac's predecessor, entered land now known as Martin Creek Meadows, and created a homestead. The evidence is also undisputed that sometime between 1886 and the summer of 1900, he appropriated water to irrigate the land and built a ditch

to carry the water. The question, however, is when did Conrad Sack appropriate the water? The Water Court granted a first priority to Hill based on a May 1, 1895 appropriation, and Merrimac was required to prove that Conrad Sack appropriated the water before May 1, 1895 in order to come ahead of Hill's priority. The evidence is insufficient to support Merrimac's contention that Conrad Sack appropriated the water in the "summer of 1886" or anytime before May 1, 1895.

Merrimac's claim to priority focuses on the contents of documents filed by Conrad Sack in 1900 to support his claim for a homestead dating back to the summer of 1886. Conrad Sack filed an affidavit in support of his 1886 homestead preemption, and stated that he first made entry on August 15, 1886 and that he established a residence five days later, on August 20, 1886. Two of the questions on the form, together with the answers given, form the basis for Merrimac's claim that Conrad Sack appropriated water and actually irrigated in 1886:

> "Q. What use have you made of the land? A. Used it for hay and farming purposes.
>
> "Q. How much of the land, if any have you broken and cultivated since settlement, and what kind and quantity of crops have you raised? A. 10 acres broken, raised crops each year; 30 acres irrigated and made hay land." (Emphasis added.)

Merrimac relies on the emphasized language above, and argues that its plain meaning requires a conclusion that the land was irrigated each year, beginning in 1886. The Water Court concluded, however, that no earlier date than May 1, 1900 could be justified. The documents were signed on August 25, 1900, and because there is no indication when irrigation started, the Water Court concluded that the first application

of water "was at the beginning of the growing season in May of 1900, since no earlier date could be justified." While we may not agree with the reasoning of the Water Court, and it may be fair to assume that first application of water did take place before 1900, we are left with the same dilemma of the Water Court in determining when that application took place, for the record is devoid of evidence indicating when the irrigation started. It was Merrimac's burden to prove when the irrigation started, and Merrimac failed in that proof.

Merrimac argues that it is most reasonable to assume irrigation started in 1886 because that is when Conrad Sack made his homestead entry. He argues that circumstantial evidence as to how Conrad Sack applied water in another land entry situation involving what is now Martin Creek Meadows, supports an inference that he would have done the same thing with regard to the 1886 land entry. We do not reach the same conclusion.

According to his 1900 application for a homestead, Conrad Sack entered the land on August 15, 1886, at a time when the growing season was over. It is unlikely that he would have planted crops in August, but assuming he had done so, it is even more unlikely that he could have built the ditches and appropriated the water through the ditches before the cold winter set in.

The other land entry made by Conrad Sack, in 1896, was based not on the Homestead Act, but on the Desert Land Act, which had different legal requirements before application could be made for a land patent. In this situation, Sack started irrigating immediately upon taking possession of the land. The Desert Land Act, to enable one to obtain a land

patent, required an appropriation of water and irrigation of land as a condition to making a claim to the land. This contrasts with a Homestead Preemption patent claim, in which issuance of a patent is not conditioned on the appropriation of water or the irrigation of land. Rather, it is conditioned on building a house and living on the land.

It may be reasonable to assume that Conrad Sack appropriated the water and irrigated the land before 1900, but we have no way of determining whether it took place before 1895 or after 1895. Merrimac could only establish first priority if he could prove that the application of water took place before May 1, 1895, the date on which Hill's predecessor first applied Martin Creek water. That proof was not produced.

Although we held that Merrimac did not establish an 1886 priority date for first application of water, we also reject Hill's cross appeal claiming that Merrimac also failed to establish a 1900 priority date because of failure to prove the water came from Martin Creek. Hill bases this claim on the 1900 homestead application filed by Conrad Sack, which did not mention where he obtained the water to irrigate the land. Hill argues that the land is located in the area of Cameron Coulee (a/k/a Pacific Creek) and that it is just as likely that the water came from this source. The uncontradicted evidence is, however, that for as long as living witnesses could remember, the land involved has been irrigated from the same ditch in this location, and that Martin Creek water flows through this ditch. Hill and his predecessors were on notice for all these years that Martin Creek was the water source, and never was there a complaint

that Merrimac and its predecessors were illegally using Martin Creek water to irrigate from the ditch.

We affirm the Water Court's order and decree setting forth the priorities for Martin Creek.

VII. WATER PRIORITIES--DAVIS CREEK

Both parties raise issues with regard to the priorities granted for Davis Creek water. The Water Court granted first and second priority to Hill. Both the first and second priorities were based on the answer filed by Owen Fergus in the 1929 District Court case of Spencer v. Silve, Fergus and Duncan (discussed in detail in Part V(B), of this opinion). The first priority had a May 1, 1884 priority date, referred to as the "Conway Ditch." The second priority had a priority date of May 15, 1884, referred to as the "Papillion Ditch."

The third, fourth, equal fourth, and fifth priorities were granted to Merrimac. The third had a priority date of May 1, 1897, the fourth had a priority date of May 1, 1898, the equal fourth also had a priority date of May 1, 1898, and the fifth had a priority date of 1916.

Merrimac first contends that Hill did not prove the first and second priorities because the Water Court improperly relied on the answer filed in the 1929 District Court case entitled Spencer v. Silve, Fergus and Duncan. In Part V of this opinion, we have detailed the background of this 1929 case and also held that the Water Court improperly relied on the answer filed in that 1929 case and that the testimony before the Water Court did not corroborate the dates on which the water was first applied. The effect of our holding is that Hill did not prove the 1884 priority dates and Merrimac's priorities take precedence over those of Hill.

- 32 -

Merrimac also argues that one of its fourth priorities, as granted by the Water Court--the May 1, 1898 priority date for 54.8 miner's inches of water to irrigate lands in the N1/2 of Section 33--should be given an 1882 priority date, the effect of which would make this the first priority. Merrimac contends that it proved water was first applied by Ed Simpson, Merrimac's predecessor, in 1882. This claim is based on the 1900 application for a homestead patent by Simpson, in which Simpson made certain statements by which Merrimac would have us infer were sufficient proof that irrigation began in 1882.

In his application for a homestead, filed in 1900, Ed Simpson signed an affidavit stating he entered the claim on August 1, 1882. In answering the question of what improvements he had made on the land since settlement, Simpson answered: "House; Stable; Cattle Shed; 2 Miles 4 Wire Fence; 1 Mile Ditch, 15 Acres broken; value $800."

In answering the question of how much land he had broken and cultivated since settlement, and what kind and quantity of crops he raised, Simpson answered: "15 acres and raised a crop each year, cut 50 ton of hay each year." (Emphasis added.)

Merrimac argues that the plain meaning of this statement is that Simpson raised a crop on his plot and also cut 50 ton of hay "each year since 1882." Merrimac therefore argues that "the most reasonable inference is that this production was from land irrigated by his ditch system." Merrimac further argues that a copy of the first map of the area, made in 1899 but based on a survey in 1898, shows irrigation ditches in place and cultivated ground on Simpson's place at that time. From this, Merrimac would have this Court

conclude that the most reasonable inference is that Simpson built the ditches and applied the water in 1882.

The Water Court, however, based its decision on the only evidence before the Court as to when it could most reasonably be determined that the land was being irrigated. The Water Court therefore based its decision on the 1899 map (based on an 1898 survey) which showed the ditches in place. Accordingly, a May 1, 1898 priority date was established.

Although the evidence may support an inference that the ditches were on the land before 1898, we are faced again with a situation where it is impossible to determine when the ditches were built and water first applied. For example, Merrimac's argument that the ditches were built and water first applied in 1882, ignores the fact that entry was not made on the land until August 1, 1882. It would be extremely unlikely that Simpson, who made entry under a Homestead Preemption entry, would first have built the ditches and applied water to the land. The application for his homestead patent states that Simpson's first act was to build a house, although he later built a stable, cow shed, strung two miles of fence, and dug one mile of ditch. Under the Homestead Preemption entry, Simpson was not required to dig ditches or apply water within a certain time in order to obtain a land patent. There being no evidence in the record as to when the ditches were built or water first applied, we conclude that the Water Court was correct in holding that 1898 was the first year that it could be definitely established that ditches were in existence and that water was most probably applied.

In his cross-appeal, Hill attacks two of the Davis Creek water priorities granted to Merrimac. Hill contends that the

1898 priority granted to Merrimac for irrigation of the "Simpson Place" must be eliminated because Merrimac failed to prove the source of water for the irrigation, the place of use, and the acreage irrigated. Hill also contends that the 1916 priority granted to Merrimac to irrigate from the Upper Davis Runoff is similarly defective for failure to identify the place of use or the source of supply.

Ample proof exists to prove the 1898 priority. The Water Court awarded 54.8 miner's inches to irrigate 54.8 acres from diversions 6, 7, and 8. Merrimac presently irrigates 54.8 acres on the Simpson Place from diversions 6, 7, and 8, and the trial testimony is undisputed that Merrimac has always irrigated this same land from the same ditches for as long as the witnesses at trial could remember. The water has always come from Davis Creek, or more correct, from Simpson Springs, a tributary to Davis Creek. The historical evidence of Simpson's irrigation activities, presents circumstantial evidence that the same lands were irrigated at least as early as 1898, the year in which the survey was made indicating the existence of the ditches.

We note, furthermore, that Hill is in no position to complain of this 1898 priority granted to Merrimac, because the evidence clearly demonstrates that Hill cannot be hurt by Merrimac's use of this water. The source of the water is Simpson Springs, which ultimately drains into Davis Creek. However, this spring drains into Davis Creek below any of the Hill ditches. Hill therefore has no interest in the waters of Simpson Springs, and cannot object to Merrimac's use of this water.

Hill also contends that the 1916 priority granted to Merrimac for a use right--a right established by

longstanding, unchallenged use of the excess water from Upper Davis Creek Meadows to irrigate the land involved--must be eliminated because Merrimac failed to establish the place and source of use. Both Lennie McDonald and Jim McDonald, owners of Merrimac, testified to use of the excess water from Upper Davis Creek to irrigate the land involved. Both Lennie McDonald and Jim McDonald, testified to historic use, and present day irrigation maps clearly show irrigation of this land from Upper Davis Creek. Hill has failed to set forth any contradictory evidence, and the Water Court relied on all the evidence before it when it awarded this priority. The evidence clearly supports the 1916 priority granted to Merrimac.

The effect of our holdings on the Davis Creek issues is that Merrimac's third priority moves to first priority, Merrimac's fourth and equal fourth priority move to second and equal second priority, and Merrimac's fifth priority moves to third priority.

VIII. CAMERON COULEE IS NOT A TRIBUTARY TO MARTIN CREEK OR TO PAUL CREEK

In his cross-appeal, Hill contends that he is entitled to the excess water flow from Cameron Coulee after Merrimac has satisfied his 18.6 miner's inches awarded by the Water Court. Although Hill concedes Merrimac's claim to the 18.6 miner's inches, Hill contends that Cameron Coulee is a tributary to Paul Creek or to Martin Creek, and therefore that he is entitled to satisfy his downstream irrigation needs from this excess water source once Merrimac has obtained his 18.6 miner's inches.

For his proof, Hill relies on a 1899 government map and the desert land claims of Conrad Sack, a predecessor to

Merrimac. The map depicts Cameron Coulee (a/k/a Pacific Creek) to be a tributary to Martin Creek; also, Conrad Sacks's Desert Land claim, based on a May 1, 1896 appropriation, states that Cameron Coulee is a tributary to Martin Creek. The Water Court, however, was convinced that the more persuasive evidence proved that the water in Cameron Coulee disappears into the ground before it reaches any creek and therefore that it was not a tributary to any creek. Substantial evidence supports the Water Court's finding, and based on this evidentiary picture, Cameron Coulee is not legally a tributary. See Anderson v. Spear-Morgan Livestock Co. (1938), 107 Mont. 18, 79 P.2d 667.

We note, furthermore, that Hill did not contend at trial that Cameron Coulee was a tributary to Martin Creek; rather, Hill contended only that Cameron Coulee was a tributary to Paul Creek, and the Water Court confined its ruling to this issue. Although Hill cannot for the first time on appeal change the theory of his case, we nonetheless conclude that the evidence is sufficient to sustain a finding that Cameron Coulee is not a tributary to any creek. We therefore affirm the Water Court's ruling.

IX. MEASURE OF WATER FLOW PER ACRE TO WHICH PARTIES ARE ENTITLED

Merrimac contends that it is entitled to 1.25 miner's inches per acre for each of its water rights rather than the 1 miner's inch per acre as set forth in the Water Court's amended decree. Hill does not dispute this 1.25 miner's inches per acre as the proper quantity, but argues that if Merrimac gets this amount Hill is entitled to the same amount. We remand for a further hearing on this issue.

In a general finding, applicable to both parties, the Water Court found that: "A flow rate of 1.25 miner's inches per acre is a sufficient and necessary amount of flow to irrigate the lands of the parties hereto."

Based on this finding, the decree, in setting forth Merrimac's rights, and also those of Hill, used 1.25 miner's inches per acre as the factor to be applied to the acreage irrigated.

After the decree and judgment, however, Hill moved to amend the findings and conclusions, although Hill did not move to amend the 1.25 miner's inches per acre finding. The Water Court amended the findings and conclusions on other matters, but did not amend the 1.25 miner's inches per acre finding. The decree affecting Merrimac, however, effectively granted Merrimac only one miner's inch per acre for all of its water rights. Because the 1.25 miner's inches per acre finding was not changed, Merrimac argues that the change affecting Merrimac must be a clerical or bookkeeping error and asks that this Court determine 1.25 miner's inches to be the proper measure.

It appears that the evidence would support either a finding of 1 miner's inch per acre or 1.25 miner's inches per acre as the measure to which each party is entitled, but we have no explanation for the change in the decree as it affected Merrimac. We therefore remand for the Water Court to determine whether 1 miner's inch per acre is the proper measure for each party or whether it should be 1.25 miner's inches per acre.

X. WHETHER HILL MAY HAVE BEEN GRANTED EXCESSIVE WATER BECAUSE OF FAILURE OF WATER COURT TO DETERMINE HILL'S TOTAL ACREAGE UNDER IRRIGATION

In awarding water rights to Hill the Water Court failed to determine how many acres Hill has under irrigation for each of the water rights. Rather, the Water Court simply granted to Hill a certain number of miner's inches for each of the rights granted. The parties differ widely on their estimate of the number of acres that Hill had under irrigation. Merrimac contends that Hill had a total of 426.9 acres under irrigation and Hill contends that he had a total of 1,890 acres under irrigation. If Merrimac is correct clearly Hill was awarded excess water for each of his water rights. On the other hand, if Hill is correct, then the water awarded for each water right may not be excessive. Merrimac argues, and we agree, that this issue cannot be resolved unless there is a fact determination on each water right as to how many acres are being irrigated.

The problem arises in part from the original findings and conclusions entered by the Water Court. In finding no. 10 the Water Court set forth the acreage that Merrimac had under irrigation for each water right and the number of miner's inches that Merrimac was entitled to for each water right. However, nowhere in the original findings or in later findings did the Water Court determine the number of acres Hill had under irrigation for each claimed water right. Although the Water Court did decide the number of miner's inches that Hill was entitled to for each claimed water right, this finding is meaningless without another finding on the number of acres under irrigation.

Although Hill devotes a large part of his brief to justifying the number of miner's inches granted for each water right, Hill ignores the fact that, regardless of his interpretation of the evidence, the findings are deficient.

We will not affirm the Water Court where the findings and supporting memoranda leave us in the dark as to whether the Water Court made determinations of Hill's acreage under irrigation, and, if so, how the Water Court arrived at those determinations.

We therefore remand this issue to the District Court to enter findings on Hill's acreage under irrigation for each water right, and then to determine the total miner's inches per acre to which Hill is entitled, based on the appropriate measure of water flow.

XI. WHETHER HILL'S RIGHT TO IRRIGATE WAS IMPROPERLY RESTRICTED TO THE AREAS DESIGNATED IN THE HISTORICAL APPROPIATIONS

In his cross-appeal, Hill contends that the Water Court improperly confined his water rights to those areas described in the original appropriations, and that instead the Water Court should have based the water rights on the lands which Hill is presently irrigating. Merrimac agrees essentially that the case must be remanded for the Water Court to make the necessary findings as to the lands presently being irrigated by Hill.

Hill contends that in the early 1900's, after the ownership merged in one owner, the new owner marshaled and accumulated the water rights and diverted the water to various lands whenever and wherever needed without regard to the original points of diversion or original places of use as established in the historical documents. Hill contends that he is entitled to irrigate based on the changed applications and properly points out that the Water Court, in awarding priorities to Merrimac, based them on the land which Merrimac is currently irrigating. Merrimac essentially agrees with

Hill's position and states that the case must be remanded for the Water Court to make these essential findings, because the Water Court "did not take sufficient care to define correctly the areas where Hill applies irrigation water . . ."

The problem was caused in part by the failure of the Water Court to change its findings to reflect the new legal relationship between the parties after the Water Court reversed itself and declared that Merrimac had not proved a prescriptive right to the use of water from Martin Creek and Davis Creek. Upon reversing its holding, the Water Court should have expanded its findings to adequately describe the land that Hill currently irrigates.

Because the original ruling was in favor of Merrimac on the prescriptive use issue, it was not necessary for the Water Court to detail the lands which Hill had under irrigation. Merrimac was the upstream user, and having a prescriptive right to use water from both Martin Creek and Davis Creeks, Merrimac was entitled to first satisfy all its water needs before Hill could satisfy any of its water needs. The result of this prescriptive ruling is, of course, that Hill could use the remaining water however he saw fit without adversely affecting Merrimac's use of the water. However, when the Water Court reversed its prescriptive rights ruling by declaring that Merrimac had not proved its claim, the effect of this decision was to trigger certain priority rights in Hill over Merrimac and there was a corresponding need to determine the land that Hill was currently irrigating. The Water Court failed to do this.

We remand this cause for the Water Court to make the necessary findings, and to take additional evidence if necessary, as to the lands that Hill is currently irrigating.

## XII.  CONCLUSION

We have disposed of the many issues in each of the numbered sections, and in each of these sections dealing with the issues we have indicated whether the Water Court's decree has been affirmed or reversed, and whether additional findings must be entered or even more evidence taken before each issue can be properly resolved.

The order and decree of the Water Court is affirmed in part and reversed in part, and we remand for further proceedings consistent with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices